# EXHIBIT 1



*Worldwide leaders in public and management accounting*

**Forensic & Valuation Services Practice Aid**

# Calculating Lost Profits

© 2020 Association of International Certified Professional Accountants. All rights reserved.

For information about the procedure for requesting permission to make copies of any part of this work, please email copy-right-permission@aicpa-cima.com with your request. Otherwise, requests should be written and mailed to the Permissions Department, AICPA 220 Leigh Farm Road, Durham, NC 27707-8110

## *Notice to Readers*

This publication is designed to provide illustrative information about the subject matter covered. It does not establish standards or preferred practices. The material was prepared by AICPA staff and volunteers and has not been considered or acted upon by AICPA senior technical committees or the AICPA board of directors and does not represent an official opinion or position of the AICPA. It is provided with the understanding that the AICPA staff and the publisher are not engaged in rendering any legal, accounting, or other professional service. If legal advice or other expert assistance is required, the services of a competent professional should be sought. The AICPA staff and this publisher make no representations, warranties, or guarantees about, and assume no responsibility for, the content or application of the materials contained herein and expressly disclaim all liability for any damages arising out of the use of, reference to, or reliance on such material.

The AICPA's Code of Professional Conduct (AICPA code) has updated the definition of *client* to be defined as both engaging entity (typically engaging attorney or attorney's firm) and subject entity (typically attorney's client). Effective December 31, 2017, the term *client* is defined as "any person or entity, other than the member's employer that engages a member or member's firm to perform professional services (engaging entity) and also, a person or entity with respect to which a member or member's firm performs professional services (subject entity). When the engaging entity and the subject entity are different, while there is only one engagement, they are separate clients." (ET sec. 0.400.07) [fn 1]

For purposes of this practice aid, "attorney," "litigant's attorney," and "counsel's client" are all considered *client* as defined by the AICPA code.

### Update as of January 1, 2020

The AICPA's Forensic and Valuation Services Executive Committee issued Statement on Standards for Forensic Services (SSFS) No. 1 (FS sec.100) [fn 2] to protect the public interest by preserving and enhancing the quality of practice of a member performing forensic services. Effective for engagements accepted on or after January 1, 2020, SSFS No. 1 establishes standards for a member providing services to a client as part of litigation and investigation engagements. The term litigation as used in SSFS No. 1 and throughout this practice aid is not limited to formal litigation but is inclusive of disputes and all forms of alternative dispute resolution, unless otherwise stated. [fn 3]

---

[fn 1]   All ET sections can be found in AICPA *Professional Standards*.

[fn 2]   All FS sections can be found in AICPA *Professional Standards*.

[fn 3]   See Statement on Standards for Forensic Services No. 1, paragraph 1.

## *Acknowledgments*

The authors of this practice aid are members of the AICPA Forensic and Litigation Services Damages Task Force:

Greg Regan
Jack Schwager
Holly Sharp
Christian Tregillis
Alex Walther

In addition, members of the AICPA's Forensic and Litigation Services Committee and the Forensic and Valuation Services Executive Committee also provided information and advice to the authors and AICPA staff for the update to this practice aid.

**AICPA Staff**

Barbara Andrews
*Director, Forensic, Technology and Management Consulting Services*
FVS Section

Christine N. Cutti-Fox
*Senior Manager, Forensic Services*
FVS Section

      © 2020 Association of International Certified Professional Accountants

## *Contents*

**Chapter 1 — Introduction**......................................................................................................**9**

Intent of the Practice Aid ..................................................................................................... 9

Practice Aid Overview .......................................................................................................... 9

Case Study Background Information ................................................................................... 10

**Chapter 2 — Legal Principles**................................................................................................**11**

Introduction ........................................................................................................................ 11

Lost Cash Flow Versus Lost Income .................................................................................. 11

Types of Damages ............................................................................................................... 11

Causation ............................................................................................................................ 12

Reasonable Certainty .......................................................................................................... 15

Foreseeability ..................................................................................................................... 16

Distinguishing Alleged Violative Acts From Other Acts, Including Subsequent Events ..... 16

Identifying Multiple Harmful Acts ..................................................................................... 17

**Chapter 3 — Lost Profits as a Measure of Damages**............................................................**19**

Introduction ........................................................................................................................ 19

Figure 3.1. Summary of Lost Profits .............................................................................. 20

Causes of Action Giving Rise to Lost Profits Damages Claims........................................... 21

Breach of Contract .......................................................................................................... 21

Torts ................................................................................................................................ 22

Other Matters Giving Rise to Lost Profits Analysis ........................................................ 22

**Chapter 4 — Calculation of Lost Profits**..............................................................................**24**

**Chapter 5 — Loss Period**......................................................................................................**26**

Overview ............................................................................................................................ 26

Breach of Contract .............................................................................................................. 27

Torts ................................................................................................................................... 29

**Chapter 6 — Estimating Lost Revenues** ................................................................................. **31**

Overview ...................................................................................................................................... 31

Understand the Allegations ......................................................................................................... 31

Understand the Agreements and Contracts ................................................................................. 32

Request, Analyze, and Understand Relevant Documents and Information .................................. 33

Assess the Reliability of Available Information ........................................................................... 34

Determine the Applicable Method and Estimate But-For Revenues ........................................... 35

The "Before-and-After" Method .......................................................................................... 36

Figure 6.1. Historical Revenues for 11th Location .............................................................. 37

The "Yardstick" (or "Benchmark") Method ........................................................................ 38

Measurement Based on the Terms of the Contract .............................................................. 39

Other Methods ..................................................................................................................... 40

Past and Future Lost Revenues .................................................................................................... 40

Figure 6.2. Summary of Lost Revenues ............................................................................... 40

Do the Lost Revenues Make Sense and Are They Reasonable? .................................................. 41

Scenarios ...................................................................................................................................... 42

**Chapter 7 — Costs** ........................................................................................................................ **43**

Overview ...................................................................................................................................... 43

Variable, Marginal, Incremental, Saved, Avoided, and Fixed Costs ........................................... 43

Evaluation of Specific Cost Line Items ...................................................................................... 45

Figure 7.1. Historical Company Cost Analysis .................................................................... 46

Figure 7.2. Total Company Food Expense Compared to Total Food and Beverage Revenue ... 47

Figure 7.3. Executive Compensation Expense Compared to Total Food and Beverage Revenue ... 48

Statistical Analysis ...................................................................................................................... 48

Figure 7.4. Selected Regression Output: Exec. Comp. Expense Regressed Against Total Food and Beverage Revenue ................................................................................................................ 49

         © 2020 Association of International Certified Professional Accountants

Figure 7.5. Selected Regression Output: Exec. Comp. Expense Regressed Against Revenue and CFO Presence ................................................................................................................................................ 50

Company-Specific Factual Investigation ........................................................................................... 50

Figure 7.6. Total Parent-Level Expenses Compared to Total Food and Beverage Revenue ....................... 51

Figure 7.7. Legal Expenses, Stores Open at Year-End, and New Stores by Year .................................... 51

Figure 7.8. Possible Categorization of Costs .................................................................................... 52

**Chapter 8 — Prejudgment Interest** ............................................................................................ **53**

Overview ......................................................................................................................................... 53

Prejudgment Interest and Lost Profits Calculations Under Federal and State Law ............................ 54

Sample Calculations of Prejudgment Interest ................................................................................... 55

Figure 8.1. Prejudgment Interest Using Simple Interest ..................................................................... 55

Figure 8.2. Prejudgment Interest Using Annual Compounding ........................................................... 56

Prejudgment Interest Period ............................................................................................................. 56

Prejudgment Interest Rates in Federal and State Courts ................................................................... 57

Considerations in Selecting a Prejudgment Interest Rate .................................................................. 57

Risk-Free Rate .............................................................................................................................. 58

Defendant's Cost of Unsecured Borrowing .................................................................................... 58

Plaintiff's Cost of Borrowing or Return on Investment .................................................................. 59

Plaintiff's Cost of Capital or Cost of Equity ................................................................................. 59

The Prime Rate and Other Rates .................................................................................................. 59

The Role of the Practitioner ............................................................................................................ 59

Post-Judgment Interest .................................................................................................................... 60

Ex Ante and Ex Post Calculations .................................................................................................. 60

Figure 8.3. Ex Ante Discounting and Prejudgment Interest ............................................................... 60

**Chapter 9 — Discount Rates** ................................................................................................... **62**

Overview ......................................................................................................................................... 62

**Chapter 10 — Taxes** ................................................................................................................ **64**

Overview ................................................................................................................................ 64

"In Lieu of" and "Origin of the Claim" ................................................................................. 64

*Raytheon* and the "In Lieu of" Test ..................................................................................... 64

Gilmore's "Origin of the Claim" Test for Damages or Settlements Paid ............................. 65

Timing of Profits Lost Versus Damages Received ............................................................... 65

    Figure 10.1. Example of Effect of Timing of Damages Compared to Damages Award Receipt ................ 66

Discount Rates and Taxes ..................................................................................................... 66

    Figure 10.2. Taxes on Growth During Discounting Period ........................................................ 67

**Chapter 11 — Mitigation** .................................................................................................... **68**

Overview ................................................................................................................................ 68

Cases With a Reduction in Lost Profit Damages for Failure to Mitigate ............................ 69

Cases With Offsets in Lost Profit Damages for Mitigation ................................................. 69

Cases Showing Exceptions to the Mitigation-of-Damages Doctrine ................................... 70

Cases Addressing Mitigating Revenues Versus Additional Revenues ................................. 70

Application of the Mitigation-of-Damages Doctrine ............................................................ 71

Limitations to the Plaintiff's Ability to Mitigate ................................................................. 71

Suggestions for Practitioners in Evaluating Mitigation in Lost Profits Claims .................. 72

**Appendix A — Case Opinions** ............................................................................................ **73**

    © 2020 Association of International Certified Professional Accountants

# Chapter 1

## *Introduction*

### Intent of the Practice Aid

When a business experiences an actionable harm, one of the most commonly sought remedies is the award of damages measured as the business' lost profits. Because of their unique skills and knowledge, practitioners with expertise in the forensic accounting and valuation disciplines are frequently requested to measure lost profits in commercial disputes as both non-testifying consultants and testifying expert witnesses. [fn 1] These lost profits analyses are often subjected to intense scrutiny by attorneys, other financial practitioners, and triers-of-fact. For this reason, practitioners engaged to measure lost profits confront the need to perform sound analyses that are credible from a theoretical perspective (for example, in the fields of economics, finance, and accounting), tied to facts, and legally admissible.

The intent of this practice aid [fn 2] is to provide nonauthoritative guidance to practitioners of all levels who are engaged to measure lost profits. This practice aid is not intended to be a treatise on the topic of lost profits but, rather, is designed to assist practitioners by identifying and addressing issues of concern that may arise in the determination of lost profits. Many of the topics discussed in this practice aid are explored in greater depth in other resources, including other practice aids published by the AICPA. [fn 3]

### Practice Aid Overview

Lost profits analysis occurs at the nexus of law, economics, finance, and accounting; it may also involve other disciplines (for example, statistics and valuation) and industry-specific considerations. This practice aid discusses legal topics, including damages theories, the legal standards for recovery of lost profits, and the causes of action that commonly give rise to lost profits claims. Also included are illustrative references to case law, included to further an understanding of key legal considerations when measuring lost profits. Appendix A, "Case Opinions," lists all cases referenced within this practice aid.

---

[fn 1]   Practitioners performing forensic services as defined by Statement on Standards for Forensic Services (SSFS) No. 1 (FS sec. 100), such as economic damages calculations, are subject to the requirements of SSFS No. 1. SSFS No. 1 establishes standards for a member who provides forensic services as part of both litigation and investigation engagements, which are defined therein. In addition, practitioners performing litigation or investigation engagements to measure lost profits that also involve the provision of valuation services should follow the standards set forth in VS section 100, *Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset*. VS section 100 addresses distinctions between requirements for valuations and lost profits calculations. Both SSFS No. 1 and VS section 100 can be found in AICPA *Professional Standards*. Although VS section 100 does not apply to lost profits analyses, certain of the standards outlined in VS section 100 may be applicable to other measures of economic damages under consideration by practitioners engaged to measure damages, including the loss of business value.

[fn 2]   The AICPA previously issued Practice Aid 06-4, *Calculating Lost Profits*, to provide nonauthoritative guidance to practitioners engaged to prepare an analysis of lost profits. This practice aid supersedes Practice Aid 06-4.

[fn 3]   For example, see the practice aids *Attaining Reasonable Certainty in Economic Damages Calculations*, *Calculating Intellectual Property Infringement Damages*, and *Discount Rates, Risk, and Uncertainty in Economic Damages Calculations*.

© 2020 Association of International Certified Professional Accountants                                                 9

Although this practice aid discusses legal concepts and requirements in connection with performing lost profits analyses, it is not intended to provide legal advice. Legal standards and requirements vary based on facts and circumstances, causes of action, the legal jurisdiction, and the continuously evolving body of legal precedent. Practitioners providing services in connection with measuring lost profits are advised to discuss legal concepts and requirements specific to their engagements with counsel.

After introducing legal concepts affecting lost profits measurements, this publication addresses methodologies for measuring lost profits and common approaches for estimating elements of a lost profits calculation. Throughout this practice aid, key considerations when performing lost profits analyses are highlighted, and practical approaches to common issues are discussed. To illustrate the practical application of the concepts introduced herein, reference is made throughout to a hypothetical business dispute between a restaurant franchisor and its franchisee. This case study is an important complement to the conceptual guidance provided herein.

## Case Study Background Information

In 2009, Franchisee LLC (Franchisee) entered into a franchise agreement with Franchisor Corp. (Franchisor), a franchisor of fast casual dining establishments under the "American Kitchen" trade name, whereby the Franchisee obtained the exclusive right to develop and operate American Kitchen restaurants in the Baltimore-Washington, DC metropolitan area (the Franchise Zone). Pursuant to the franchise agreement, Franchisee agreed to pay Franchisor a franchise fee for use of the American Kitchen trade name, trademarks, and for certain services provided by Franchisor. Franchisee additionally agreed to pay Franchisor certain fees based on a percentage of store revenues. Franchisor agreed to provide Franchisee with its franchisee operating manual and promotional materials as well as access to training, development, and operations advisory services. Franchisor also agreed to include the Franchise Zone in its national ad campaigns. Although Franchisee was responsible for the actual development and operation of each restaurant in the Franchise Zone, Franchisor maintained some control over the development and operations of restaurants developed by Franchisee, including the location, restaurant layout, signage, products, supply chain sources, and product pricing, per the franchise agreement. The franchise agreement had a 10-year term and was renewable for additional 5-year terms thereafter, at the election of Franchisor, subject to achievement of certain key financial and quality performance metrics by Franchisee.

In 2010, Franchisee opened and began operating eight American Kitchen eatery locations in the Franchise Zone. In 2011, and again in 2013, Franchisee opened one additional American Kitchen eatery location in the Franchise Zone. From 2013–2016, Franchisee operated 10 American Kitchen eateries.

In late 2016, Franchisee submitted a development plan to Franchisor to build and operate its 11th location, on a prominent college campus, as part of a new mixed-use development to be built in 2017. Franchisor rejected the development plan, citing concerns regarding the planned location and restaurant layout, and Franchisor's perception that it deviated from the American Kitchen brand's targeted consumers.

In 2017, Franchisee filed a lawsuit against Franchisor, asserting breach of contract. In particular, Franchisee asserted that Franchisor lacked contractual authority to reject the development plan. Franchisee asserted damages from the inability to open the new American Kitchen location in 2017.

          © 2020 Association of International Certified Professional Accountants

# Chapter 2

## *Legal Principles*

### Introduction

A practitioner performing forensic services as a damages expert should develop an understanding of the legal principles governing the recovery of damages. At times it is helpful to discuss these legal matters with counsel, such as when the applicable state or federal law affects the calculation. As a general matter, the plaintiff will likely need to prove that (*a*) the asserted wrongful acts proximately caused the alleged harm (causation) and (*b*) the damages were calculated to a reasonable degree of certainty (reasonable certainty). When damages are the result of a breach of contract claim, the damages must also have been foreseeable.

These concepts can be illustrated in the context of the American Kitchen example summarized in chapter 1. For example, causation concerns may arise regarding the adequacy of Franchisee's financial resources to expand to an 11th location, or the opening of other competitive restaurants near the new location. Reasonable certainty challenges may arise if there are no financial projections available or there is a lack of benchmark data, or both. Further, foreseeability considerations may arise if, for example, Franchisee seeks recovery of damages beyond the 10th year of the parties' arrangement. These interrelated topics are addressed further in the next section.

### Lost Cash Flow Versus Lost Income

Practitioners engaged to measure lost profits damages may calculate either lost cash flow or lost incremental income, depending on the facts and nature of the income and cash flow stream in question, and the nature of the dispute. Although practitioners often assume the two measures to be the same, this is not always the case, and which measure is appropriate is case-specific. Using the American Kitchen example, Franchisee may have had to expend cash early on, but these costs may be capitalized. This situation may cause profits to equal cash flow in the long term, but time-period differences may affect discounting or prejudgment interest calculations. In addition, a plaintiff may need to make ongoing working capital investments, such that cash outflows exceed costs on an income statement. As a result, practitioners should be aware of these differences when developing a lost profits model.

### Types of Damages

The following table summarizes two types of compensatory damages that the plaintiff may have experienced in the context of a breach of contract:

| Type of Damages [fn 1] | Methodology |
| --- | --- |

---

[fn 1]   It is not the objective of this section to provide an exhaustive discussion of the types of damages measures available to the plaintiff. The practitioner should consult with counsel and sources such as *Black's Law Dictionary* for further information regarding these and other measures of damages, and particularly, which measures are appropriate for the particular causes of action and venue.

| Type of Damages [fn 1] | Methodology |
| --- | --- |
| Benefit-of-the-bargain (or "expectation") | The difference between the amount the plaintiff could be expected to have received and the amount the plaintiff received. |
| Reliance | The amount required to restore the injured party to the economic position occupied before the injured party acted in reasonable reliance on a promise. |

Lost profits is a measure used in calculating expectation damages, generally in a forward-looking manner. In contrast, reliance damages address the plaintiff's investment to obtain the benefit, typically prior to the time at which the analysis is performed, plus any out-of-pocket costs incurred by the plaintiff as a result of the harm in question, as well as consideration of what has been obtained.

The practitioner may also seek a disgorgement of the wrongdoer's profits, which is sometimes referred to as *restitution*, *unjust enrichment*, or *ill-gotten gains*. This measure (which is sometimes referred to as *damages* but more precisely is a monetary remedy, but not "damages") is focused on the benefit obtained by the defendant. If the practitioner measures both the harm to the plaintiff and the benefit obtained by the defendant, the practitioner should consider whether the two measurements overlap to avoid "double-counting."

The following table provides examples to illustrate how a practitioner may implement these types of damages (for purposes of the case study):

| Remedy | Example Methodology |
| --- | --- |
| Expectation damages | Lost profits from the expected operation of the 11th location |
| Reliance damages | Costs expended by Franchisee to evaluate the 11th location |

## Causation

To prevail in a civil lawsuit and be awarded damages, a plaintiff is generally expected to prove that

- a defendant perpetrated a wrongful act; [fn 2]

- subsequent to the wrongful act, the plaintiff experienced some economic harm, such as lost profits as a result of lost sales; and

- the defendant's behavior was the proximate cause of the economic harm claimed as damages.

The burdens described previously rest with the plaintiff, as opposed to the plaintiff's damages expert. The requirements associated with proving causation vary between disputes and the type of analysis performed. For example, a claim for lost profits from patent infringement may require proof that the in-

---

[fn 2]   Although assertions of fraud are sometimes included within counsel's presentation of allegedly wrongful acts, the damages expert should not offer an opinion on the existence of fraud. Pursuant to Statement on Standards for Forensic Services No. 1, "[t]he ultimate decision regarding the occurrence of fraud is determined by a trier of fact;" however, the damages expert "may provide expert opinions relating to whether evidence is consistent with certain elements of fraud or other laws based on objective evaluation."

© 2020 Association of International Certified Professional Accountants

fringement caused customers to not make purchases from the plaintiff, whereas a reasonable royalty as a measure of damages for the same patent infringement would typically not require proof to avail a reasonable royalty measure of damages. [fn 3]   In general, however, there are two alternative causation requirements placed on the plaintiff:

- *But-for causation.* Whether, absent the defendant's conduct, the economic harm would have occurred. [fn 4]

- *Substantial factor test.* Whether the alleged wrongful act was a substantial factor in the plaintiff's loss. [fn 5]

A plaintiff's damages expert may be asked to assume causation for the purposes of his or her work in situations in which other evidence or expert testimony may be offered on this topic. In other cases, the scope of a plaintiff's expert testimony may address or relate to causation directly or indirectly. [fn 6]   In either situation, it is generally in the client's interest for the damages expert, whether working on behalf of the plaintiff or defendant, to understand the evidence about causation. In this context, it is generally useful for the expert to understand how the plaintiff claims the alleged wrongful conduct *caused* the damages. Similarly, it is useful to understand if and why the defendant claims the wrongful conduct did not cause the damages, and whether the practitioner can perform analysis or investigation that can test and support an answer to these questions. The pursuit and analysis of such data may illuminate causation considerations, including the need to introduce evidence to support (or disprove) the claims, as well as other factors that may have influenced the purported lost sales. The damages expert should take care to offer an opinion on causation only when such an opinion is within the professional expertise of the expert and adequately supported by the evidence. For example, it may be appropriate for an expert to testify about market analysis, research, sales trends, customer reviews, and internal company communications that address the question of what factors influence sales, including the alleged wrongful conduct. But it is often beyond a practitioner's expertise to opine on the summary issue of causation, with an expert opinion that the damages in question were caused by the alleged wrongful act or acts.

As a practical matter, damages experts commonly address causation indirectly by demonstrating correlation of two variables. For instance, a plaintiff may experience a loss, such as a decline in sales, that occurred immediately after an alleged wrong. However, the plaintiff must generally present evidence (through all sources, including testimony by a damages expert) sufficient enough to prove that the loss

---

[fn 3]   Per the Patent Act (35 U.S. Code § 284 - Damages), "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."

[fn 4]   See, for example, Judicial Council of California Civil Jury Instructions (2017 edition), § 430. Causation: Substantial Factor, quoting *State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 354, "We have recognized that proximate cause has two aspects." . . . "One is *cause in fact*. An act is a *cause in fact* if it is a necessary antecedent of an event." . . . "This is sometimes referred to as 'but-for' causation." (available at www.justia.com/trials-litigation/docs/caci/400/430/, accessed January 3, 2019)

[fn 5]   See, for example, Judicial Council of California Civil Jury Instructions (2017 edition), § 430. Causation: Substantial Factor, "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm."

[fn 6]   In some instances, a practitioner may directly opine on causation, but this would typically be when the issue was specifically related to accounting or related issues, such as whether an accounting entry caused a breach of a loan covenant.

© 2020 Association of International Certified Professional Accountants                    13

in sales was attributable to the alleged wrongful act. This issue was addressed in a false advertising case in the Northern District of Alabama, *Snac Lite, LLC v. Nuts 'N More*.[fn 7] In *Snac Lite*, the plaintiff alleged the defendant had falsely advertised the protein content in its nut butter product, which had caused the plaintiff to experience lost sales and profits. As it related to damages, the court focused on two questions:

1. What evidence indicated that consumers chose the defendant's products over the plaintiff's products?

2. What evidence indicated that consumers made their choice due to the false advertising at issue?

In this matter, the opinions of the plaintiff's damages expert, a forensic practitioner, were excluded because, in the court's words, "While [the Practitioner] assumed that a causal connection existed between Defendant's alleged false statements and Plaintiff's damages, he provided no data to support such a conclusion. . . ."[fn 8] The court explained that the plaintiff did not establish that its loss of sales was the result of consumers purchasing the defendant's products. The court expected that even if the consumers had purchased the defendant's products in the past, the plaintiff had to provide evidence that purchases of the defendant's products (instead of the plaintiff's) were attributable to the defendant's false advertising. It should be noted, though, that this is a fact-specific issue, and plaintiffs are not necessarily obligated to identify each lost customer or present evidence of each customer's reason for not making a specific purchase.[fn 9] Moreover, as described previously, although it is the plaintiff's burden to present evidence of causation, it is not the responsibility of the plaintiff's damages expert to present this evidence. For example, a damages expert may refer to other experts, percipient witnesses, or documents that may address causation.

Many courts have accepted the opinions of experts who assume causation and do not cite evidence or analysis that support a causal link between the alleged wrongful acts and a damages calculation. Nonetheless, practitioners' work is strengthened by careful consideration of causation. The issue of causation is addressed in greater detail in the AICPA practice aid *Attaining Reasonable Certainty in Economic Damages Calculations*, chapter 3, "Causation Considerations."

Another frequent causation-related issue faced by practitioners is whether the practitioner "has adequately accounted for obvious alternative explanations."[fn 10] However, it is noteworthy that Federal Rules of Evidence 702 does not explicitly obligate the expert to eliminate all other possible causes of loss. The expert may consider a broad variety of data and information sources to assess whether another obvious cause of the loss exists. The following table summarizes examples of evidence and considerations related to causation and reliability in the development of revenue projections.

---

[fn 7]   *Snac Lite, LLC v. Nuts 'N More*, LLC, 2016 WL 6778268, No. 14-cv-01695.

[fn 8]   See footnote 7.

[fn 9]   See, for example, *Syngenta Crop Protection, LLC v. Willowood, LLC, et al*., Civ No. 1:15-cv-00274 (M.D.N.C.), "In addition, Willowood has presented no authority in support of its assertion that the identity of the purchasers or the categories of customer are relevant, let alone necessary, to a lost profits claim." *See also*, *Nebula Glass Int'l., Inc. v. Reichhold, Inc.*, 454 F.3d 1203 (11th Cir. 2006), "The lost profit damages in this case were not speculative simply because [Plaintiff] did not present evidence of every customer's reason for not buying Safety Plus 1 glass."

[fn 10]   Federal Rules of Evidence 702.

           © 2020 Association of International Certified Professional Accountants

| Sources of Evidence | Possible Considerations and Questions |
|---|---|
| Pre-litigation projections | What do the projections reflect for the alleged damage period? How accurate were plaintiff's prior projections? |
| Performance summaries for the business at issue (for example, board of directors meeting materials) | Do these and other contemporaneous documents address performance of the business during the damage period? |
| Interviews or testimony of key personnel | Did a significant change in personnel occur, including, for example, the loss of a key executive or a restructuring? Did the business plan, business model, or business environment change for some unrelated reason? |
| Performance summaries for other similar businesses | Does the plaintiff have other similar business activities, including other business locations? How have those business activities performed as compared to the allegedly harmed business? |
| Industry or competitor data | How have other similar unaffected businesses performed during the damage period? |
| | Was there a new competitor or product that entered during the damage period? |
| Overall economy considerations | How did the economy perform, as a general matter, during the damage period? |

These considerations and others may be addressed through different forms of analysis and evidence. For example, individuals can either be interviewed or provide deposition testimony. The damages expert may also obtain such information in document discovery or in interrogatories, or through independent research.

Although other factors may also have some effect on the plaintiff's sales and profits, it may not be practicable to determine the exact effect of all other possible influences, given that many of these are de minimis. It is preferable, however, to show that these other factors have been considered and, when appropriate, have been taken into account in a model (for example, they are equally likely to overstate or understate the calculation).

## Reasonable Certainty

This requirement has been addressed extensively in the AICPA practice aid *Attaining Reasonable Certainty in Economic Damages Calculations*. To summarize the analysis and discussion contained therein, there is not a one-size-fits-all definition of *reasonable certainty*. Rather, reasonable certainty is normally a case-specific assessment of whether the calculation of damages was anchored in facts, makes use of sound methodologies, and yields reasonable results. It is well established that once the fact of damages has been proven, the amount of damages need not be proven with absolute certainty.

In practice, the issue of reasonable certainty is interwoven throughout a damages analysis. For example, the damages expert should be reasonably certain of issues, including

- another obvious cause of the damages does not exist;

- the data used in the analysis, including data supplied by the client, are reliable; and

- the assumptions applied in the damages analysis are reasonable and tethered to the evidence expected to be admitted in the case.

© 2020 Association of International Certified Professional Accountants                15

As noted in the *Attaining Reasonable Certainty in Economic Damages Calculations* practice aid, a key objective of the reasonable certainty standard is to ensure that plaintiffs are not awarded speculative, overly optimistic, or unrealistic damages.

## Foreseeability

When the damages are being calculated for a breach of contract cause of action, the damages typically also need to have been reasonably foreseeable at the time of contracting. [fn 11]  This requirement dates back to an English decision, *Hadley v. Baxendale*, 156 Eng. Rep. 145, 151 (Ex. 1854), and is still law today. In *Hadley*, the court set out that damages are recoverable only if they were reasonably foreseeable by both parties at the time of the contract. This does not, however, mean that a plaintiff needs to disclose, at the time of contracting, the amount of profit anticipated to or by the defendant. [fn 12]

A damages expert may provide testimony regarding foreseeability if such opinions are within the professional expertise of the witness and supported by the evidence. For example, an expert might analyze the circumstances surrounding the development of a projection by the parties, contemporaneous to contracting. Some cases require an analysis of the foreseeability of damages arising after the stated term of the contract. One such example was *Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243 (Ind. App. 2010). In this matter, an event promoter, *Belle*, alleged that *Doorway*, a carnival operator, ceased performance of services during the first year of the parties' contract. *Belle* subsequently cancelled the event indefinitely. The court ruled losses beyond the one-year contract were not foreseeable because *Doorway* could not have anticipated that *Belle* would cancel the event indefinitely. In these situations, a practitioner may look to information such as prior renewal patterns, if available. A practitioner may also consider presenting multiple scenarios, varying whether a contract was renewed and for how long.

## Distinguishing Alleged Violative Acts From Other Acts, Including Subsequent Events

A practitioner's analysis of the data and other evidence may indicate that multiple acts, including multiple acts by the defendant, contributed to the plaintiff's loss. The practitioner should be aware, however, that not all the defendant's acts may be violative (included in the causes of action before the court) or wrongful. If the practitioner includes the impact of non-violative acts in the calculation of damages, then the reliability and relevance of the damages may be called into question. This is a concept related to causation in that the calculation of damages needs to be causally linked to the violative events.

As an example, in *Biren v. Equality Emergency Med. Grp.*, the appellate court affirmed the trial court's opinion that $2 million of lost profits were speculative because the expert did not disaggregate the effect of damages caused by undercoded billings, as distinct from a lack of collection efforts, the latter of which was determined to be non-violative. [fn 13]

---

[fn 11]  Foreseeability is also a consideration in tort matters; however, the issue is often intertwined with reasonable certainty.

[fn 12]  *Emerald Investments Limited Partnership v. Allmerica Financial Life Insurance & Annuity Co.*, 516 F.3d 612 (7th Cir. 2008), "A buyer is not required to disclose the profit he anticipates from dealing with the seller; such a requirement would kill the incentive to seek out profit opportunities."

[fn 13]  *Biren v. Equality Emergency Med. Grp.*, 102 Cal. App. 4th 125 (2002), "[Expert] opined that PHSS's billing inefficiencies cost Equality more than $2 million in lost profits. These deficiencies included undercoding billing and lack of collection efforts. The court

© 2020 Association of International Certified Professional Accountants

Similarly, the practitioner should consider whether losses could be associated with unrelated external events or events subsequent to the wrongful act. Practitioners need to attempt to identify the non-violative facts affecting losses and ensure that the damage analysis identifies and calculates as damages only those losses that are violative within the asserted causes of action. For example, in the American Kitchen example, reduced revenues (and profits) due to subsequent events would not be recoverable: the opening of a nearby restaurant by a competitor, a salmonella outbreak, a decrease in promotions and marketing spend, or a low rating of American Kitchen locations by health services inspectors.

## Identifying Multiple Harmful Acts

In some instances, there may be multiple alleged violative acts that lead to damages. In these instances, the acts may consolidate into a single claim or multiple claims. For example, a plaintiff may claim that the defendant breached, in multiple ways, a contract to develop software (for example, alleged failures to develop five different features). In this case, the different alleged violative acts may be analyzed as one cumulative breach of contract claim, such that the practitioner does not ascribe specific losses to each individual failure (for example, each feature failed to be delivered). [fn 14]

In some situations, though, each alleged wrongful act could be modeled and evaluated as a separate claim. The practitioner may want to discuss with counsel the ability and need to quantify damages by wrongful act or claim. When it is practical and cost-efficient to do so, the damages expert may separately quantify the damage resulting from each alleged wrongful act (or a combination of them). In certain situations, if the acts are not "disaggregated," the rejection of a claim for one act may result in refutation of the entire analysis. For example, in *O2 Micro Intern. Ltd. v. Monolithic Power Systems*, the plaintiff's expert computed a single damages amount assuming the misappropriation of 11 trade secrets. The court cautioned O2 against such an approach. [fn 15]  Later, when the jury found that only 1 trade secret had been misappropriated, the court concluded that the expert's testimony had not been helpful to the jury.

When damages are disaggregated, the practitioner should ensure that damages for separate acts do not have an additive effect, or, if there are issues relating to such combinations, they are disclosed. In other words, damages may be common to both acts, and it may be improper for them to simply be added together to compute total damages. In addition, a practitioner may consult with counsel to understand the current status of the claims made by the plaintiffs. It may be that legal motions have been ruled upon by the court and eliminated certain claims, or certain parties have been dismissed by the time a practitioner performs a damages analysis. Further, a practitioner may be asked to testify concerning how damages are aligned with each of the legal claims. Such a question is typically a legal issue. The practitioner,

---

questioned [expert] what portion of the $2 million loss was caused by undercoding, but [expert] was unable to allocate the portion of damage caused by PHSS's poor collection efforts. The court could reasonably infer [expert's] conclusions involved speculation, making the claimed damages uncertain."

[fn 14]  For example, the court in *Braun Elevator Co. v. Thyseenkrupp Elevator Corp.* (W.D. Wis. 2005) 379 F. Supp. 2d 993 held "Neither case suggests that where multiple breaches combine to cause lost sales the jury must match particular lost sales to particular breaches, an exercise which in many instances will be impossible because intertwined breaches combine to cause lost sales."

[fn 15]  *O2 Micro Intern. Ltd. v. Monolithic Power Systems*, 399 F. Supp. 2d 1064, "[I]t seems to me that if [expert] is saying the damages are X dollars if they stole all our trade secrets, he can say that. But if the jury finds that he only stole 11 of them, then his testimony would be stricken and you would have no testimony because there'd be no basis upon which a jury could decide what the damages were from the theft of 11 secrets when they've heard testimony only about what the damages are from 12 secrets unless somehow he can say that no matter how many secrets are stolen, the same damages are accrued."

© 2020 Association of International Certified Professional Accountants

however, may consult with counsel prior to providing testimony regarding a reasonable response to such a question. [fn 16]

Finally, a practitioner may want to consult with counsel regarding the anticipated jury instructions applicable to the claim or claims. Jury instructions frequently provide useful insight regarding the applicable recovery. These insights can often be used to assist in determining how to present damages and if the practitioner needs to allocate damages between wrongful acts or claims. Although final jury instructions are not typically filed with the court until the eve of trial or during trial, model jury instructions may be useful in validating the methodology used. [fn 17]

---

[fn 16]  Experts should be aware that conferences with counsel during a deposition or while testifying at trial (including during breaks) may be prohibited and such discussions may be discoverable. For example, in *Hall v. Clifton Precision*, 150 F.R.D. 525 (E.D. Pa. 1993), the trial court held that "conferences between witness and lawyer are prohibited both during the deposition and during recesses," 150 F.R.D. at 529. Further, the Court held that anything a lawyer tells a witness during such a conference is not protected and may be inquired into by opposing counsel to determine whether any coaching has occurred. *Id.* However, some courts flatly rejected *Hall* and held that a witness has the right to confer with counsel during normal deposition breaks and recesses. See *In re Stratosphere Corp. Sec. Litig.*, 182 F.R.D. 614, 620 (D. Nev. 1998) (adhering to *Hall* could violate right to counsel); *Haskell Co. v. Georgia Pacific Corp.*, 684 So.2d 297, 298 (Fla. Ct. App. 1996) ("There is no recognized exception to the privilege for a communication between an attorney and client which occurs during a break in deposition. If a deponent changes his testimony after consulting with his attorney, the fact of the consultation may be brought out, but the substance of the communication generally is protected.").

[fn 17]  See, for example, www.floridasupremecourt.org/contract-business-jury-instructions/instructions.shtml.

18            © 2020 Association of International Certified Professional Accountants

# Chapter 3

## *Lost Profits as a Measure of Damages*

### Introduction

As described previously, damages are a monetary remedy in civil law. *Black's Law Dictionary* defines *damages* as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." [fn 1]  Lost profits are a measure of compensatory damages, which are intended to compensate an aggrieved party for harm caused by the wrongful act or acts that are the subject of the dispute. [fn 2]

As a measure of compensatory damages, damages based on lost profits redress a defendant's unlawful act or acts by compensating the plaintiff for the profits that would have been obtained "but for" (absent) the unlawful act or acts. Lost profits damages are typically measured as but-for profits less actual and mitigating profits, as illustrated in the following figure.

---

[fn 1]   Bryan A. Garner, *Black's Law Dictionary*, Tenth Edition (2014), West Publishing Co., Thomas Reuters, United States of America, p. 445.

[fn 2]   Other types of damages include nominal damages and punitive damages. *Nominal damages* are typically awarded if a compensable harm has occurred, but no substantial loss or injury exists to be compensated. *Punitive damages* are those damages awarded, in addition to actual damages, if the defendant acted with recklessness, malice, or deceit. Punitive damages are intended to punish the wrongdoer and deter certain misconduct.

**Figure 3.1. Summary of Lost Profits**



Typically, the first step in this calculation is to estimate the profits that would have been obtained by the harmed party (simplified to "plaintiff" [fn 3] ) but for the unlawful act during the damage period. This is often referred to as the *but-for scenario* or the *but-for world*. The but-for profits are measured as but-for revenues less but-for expenses (also referred to as *avoidable expenses*). Generally speaking, the but-for world is different from the "actual world" (which is often more accurately described as the "actual or mitigating world") in several ways. For example, in the but-for world, the plaintiff might have launched a new product (or done so earlier than when it was actually launched), sold more of a certain product, expanded to a new location, charged a different price, sold to different customers, saved certain costs, or earned and been paid more royalties.

Typically, the next step is to subtract the actual profits earned (or anticipated to be earned, in the event that the effects of the wrongdoing are ongoing as of the time of the damages analysis) from the but-for profits during the damage period. However, this can be complicated by the issue of *mitigation* (discussed in detail in chapter 11), which is an obligation that a plaintiff often has to maximize profits in the actual or impaired world, even if the defendant's wrongful acts have hindered the plaintiff's ability to do so. [fn 4] For example, if as a result of the wrongful acts the American Kitchen Franchisee was unable to open a restaurant in a specific location but could have opened a restaurant in another location (potentially after a delay or with lower profits), the actual or mitigating world may call for the assumption of Franchisee mitigating in a reasonable way (for example, opening an alternative restaurant). Often, the

---

[fn 3]   Although it may be possible that the injured party may also be a defendant or counterclaim plaintiff, or a claimant (as in an arbitration), the term *plaintiff* is used throughout this practice aid to refer to the injured party, and the *defendant* generally refers to the party accused of the alleged wrongful act.

[fn 4]   Mitigation may or may not be required, depending on the applicable law. See chapter 11 of this practice aid.

                    © 2020 Association of International Certified Professional Accountants

actual results will be known for past periods, but the damages period may extend into the future (for example, if in the actual world the plaintiff has not been able to get back to the but-for world's profits, and the effect of the wrongful acts is ongoing).

Chapter 4 introduces two alternative methods for calculating lost profits, including a simpler method, which may be appropriate in some situations.

After actual and mitigating profits have been deducted from but-for profits, the next step is normally to discount to present value the periodic lost profits to the extent that they occur in the future (or for all periods, if using the ex ante approach) because lost profits damages are typically awarded as a present value as of the time of the judgment. See chapter 8 for a discussion of the ex ante and ex post approaches. Chapter 9 includes a discussion of discount rates and discounting.

## Causes of Action Giving Rise to Lost Profits Damages Claims

As described previously, lost profits are often awarded as compensatory damages in civil commercial litigation. Causes of action that typically give rise to damages claims based on the injured party's lost profits include breach of contract and tort claims. Each of these is discussed briefly in the following text.

### Breach of Contract

In a breach of contract claim, the plaintiff alleges that the defendant has failed to fulfill its performance obligations under a contract and, thus, has breached the contract. In such matters, compensatory damages based on lost profits may be sought by the nonbreaching party to the contract.

Breach of contract claims may give rise to direct damages (also called *general damages*),[fn 5] as well as consequential damages (also called *special damages*).[fn 6] Direct damages flow directly from the breach and are reasonably expected from the breach (for example, costs of replacement goods or services that were contracted to be delivered but were not). Consequential damages also flow from the breach but are not necessarily expected consequences of the unlawful act (for example, a failure to perform by the breaching party, in turn, causes the plaintiff to incur other losses related to other business arrangements).[fn 7] In breach of contract claims, lost profits may be a measure of direct or consequential damages, depending on whether the lost profits were contracted (direct) versus an indirect consequence of the breach (consequential).

---

[fn 5]   Consequential, Incidental, Direct, Actual and Compensatory Damages: What are they and who gets them? Measures of Damages in Domestic and International Transactions, 2012 American Bar Association Business Law Section Spring Meeting, by Glenn D. West, Hermann J. Knott, and James R. Waltherp. p. 8, "Basic Damage Definitions[,] Direct or General Damages[,] Damages which, in the ordinary course of human experience, can be expected to naturally and necessarily result from a breach. These damages are presumed to have been foreseen or contemplated by the parties as consequences of a breach, and as such are fairly straightforward."

[fn 6]   Consequential, Incidental, Direct, Actual and Compensatory Damages: What are they and who gets them? Measures of Damages in Domestic and International Transactions, 2012 American Bar Association Business Law Section Spring Meeting, by Glenn D. West, Hermann J. Knott and James R. Waltherp. p. 8, "Consequential damages still result directly from the breach, but may not be obvious to one of the parties in advance without communication of the other party's special circumstances."

[fn 7]   Bryan A. Garner, *Black's Law Dictionary*, Tenth Edition (2014), West Publishing Co., Thomas Reuters, United States of America, p. 472.

© 2020 Association of International Certified Professional Accountants

## Torts

*Black's Law Dictionary* defines a *tort* as "[a] civil wrong, other than breach of contract, for which a remedy may be obtained, usually in the form of damages." [fn 8] Torts giving rise to lost profits damages include negligent torts and intentional torts, the latter of which affects the conduct of business.

*Negligent torts* are generally committed by failure to demonstrate reasonable care under the given circumstances, as a matter of law. Depending on the facts and circumstances, monetary damages based on lost profits may be available in these instances. As an example, assume that a person inaccurately says that chicken dishes at American Kitchen contain an average of five grams of trans fat per serving, which causes American Kitchen to have a dramatic decrease in its sales, whereas, in fact, the chicken dishes have an average of five grams of unsaturated fat (which is much healthier than trans fat but was confused by the individual who made the comment). In this scenario, American Kitchen may be able to claim lost profits as a result of the negligent tort, in this instance, defamation.

*Intentional torts* are torts that are made with intent by the wrongdoer. Economic damages in the form of lost profits may be awarded for intentional torts, including tortious interference with a contract (or expected economic advantage), unfair competition, and fraud.

Intellectual property infringement and misappropriation matters are also torts. *Intellectual property* refers to "a category of intangible rights protecting commercially valuable products of the human intellect." [fn 9] This category of intangible assets includes patents, copyrights, trademarks, and trade secrets. The practice aid *Calculating Intellectual Property Infringement Damages* provides an in-depth discussion of the compensatory damages remedies available to plaintiffs when patents, trademarks, or copyrights are infringed or trade secrets are misappropriated. As discussed in that practice aid, various damages remedies may be available to plaintiffs, including lost profits, depending on the intellectual property infringed or misappropriated.

Antitrust violations are also torts. Antitrust laws prohibit anticompetitive conduct, including monopolies, price fixing, and price discrimination. In antitrust litigations, plaintiffs seek to demonstrate that, absent the unlawful conduct of the defendant, the plaintiff's financial performance or condition would have been better than it actually has been and will be. Lost profits may be used as a measure of damages based on a comparison of the plaintiff's but-for performance with actual performance that was subject to the alleged unlawful anticompetitive behavior.

## Other Matters Giving Rise to Lost Profits Analysis

Practitioners are also commonly requested to measure lost profits in conjunction with business interruption and other insurance claims and assessments. Following a business interruption, practitioners may calculate lost profits after the occurrence of a covered event to assess the amount of claim allowed under an insurance policy. Unlike the measurement of lost profits as a measure of damages in a litigation or

---

[fn 8] Bryan A. Garner, *Black's Law Dictionary*, Tenth Edition (2014), West Publishing Co., Thomson Reuters, United States of America, p. 1626.

[fn 9] Bryan A. Garner, *Black's Law Dictionary*, Tenth Edition (2014), West Publishing Co., Thomson Reuters, United States of America, p. 881.

                        © 2020 Association of International Certified Professional Accountants

arbitration, lost profits calculated in a business interruption context commonly fall within the terms and parameters of the applicable insurance policy and are frequently resolved without litigation. [fn 10]

---

[fn 10] Sometimes, business interruption claims can result in breach of contract actions or similar causes of action against insurers for a failure to perform as required under the insurance policy.

© 2020 Association of International Certified Professional Accountants

# Chapter 4

## *Calculation of Lost Profits*

On a conceptual level, lost profits damages are generally based on one of the following two models:

1.  *Calculation of net incremental revenues lost, offset by net incremental costs avoided.* In this model, the net incremental revenue that would have been realized but for the unlawful act is calculated and then reduced by related net incremental costs avoided. For example, using the American Kitchen case study, suppose Franchisor was unable to meet its obligations to supply Franchisee's eateries with a key menu item for a period of one month, in violation of the franchise agreement's exclusive supplier terms. As a result, for 30 days, Franchisee was unable to sell a popular menu item. Assuming the only effect on Franchisee's stores was the inability to sell a key menu item for 30 days, lost profits, under this model, would be the incremental revenues from the sale of the popular menu item for 30 days, reduced by the incremental avoided costs of producing and selling that menu. If other items were determined to be affected (adversely or favorably) by the lack of availability of the menu item, a similar analysis of the incremental revenues lost (or gained), offset by the net incremental costs avoided (or incurred), would be necessary for each of these items, as well. [fn 1]

2.  *Calculation of but-for profits, net of actual or mitigating profits realized.* In this model, the net profits that would have been achieved but for the unlawful act are calculated and then offset by the actual or mitigating profits (or increased by the actual losses) following the unlawful act. Using the same preceding example, the total but-for profits associated with the menu item for that 30-day period would be calculated and then reduced by the actual or mitigating profits realized from that menu item during the same 30-day period. This might be accomplished by examining but-for profits for the single menu item and comparing those with the actual profits for that item during the 30-day period. Alternatively, a broader assessment of the whole affected American Kitchen location and its but-for and actual or mitigating profits might be performed.

In theory, these two models should render the same calculated undiscounted lost profits damages. The models should be based on an accepted methodology for estimating the incremental revenues lost or but-for profits. [fn 2] When the two models provide differing estimates of lost profits, the practitioner should evaluate the reasonableness of the analyses under each approach. Depending on the facts and circumstances surrounding the wrongful acts, one or both preceding models could be appropriate.

For example, suppose the practitioner determined that, as a result of the aforementioned supply disruption, Franchisee failed to sell 1,500 units of the popular menu item (actual sales were 0 units, compared to but-for sales units of 1,500) during the 30-day period. The item had a sales price of $3 per unit and a cost of $1 per unit. The practitioner applied the first methodology, calculating undiscounted lost profits damages of $3,000 (that is, $4,500 of incremental revenues based on 1,500 units at $3 per unit, less

---

[fn 1]   Other complications might include running the calculation beyond 30 days, if customers or sales were lost even after the supply was resumed.

[fn 2]   See chapter 6, "Estimating Lost Revenues," in this practice aid.

© 2020 Association of International Certified Professional Accountants

$1,500 incremental costs based on 1,500 units at $1 per unit). As a check, the practitioner then applied the second methodology, determining that the but-for profit anticipated for the menu item during the 30-day period was $3,000, and the actual profits related to the menu item were $0 — again concluding undiscounted lost profits damages were $3,000.

In this relatively simple example, the two models were corroborative, and both models proved easy to apply. Suppose, however, that the practitioner was concerned about potential mitigating sales of other menu items. Although the practitioner could attempt to evaluate each menu item individually under the first previously mentioned model, that model may prove burdensome when the wrongful act's effects on a plaintiff are more pervasive. Given the concerns, the practitioner also applied the second previously mentioned model to the restaurant as a whole, calculating the but-for profits during the 30-day period to be $35,500, and the actual profits during the 30-day period to be $33,500 — a difference of just $2,000, rather than the $3,000 previously calculated. This discrepancy caused the practitioner to reevaluate the completeness of the calculations of the incremental revenue and incremental costs under the initial method, which uncovered an additional (mitigating) effect in the other products. In particular, upon investigation of the discrepancy between the calculations under the two methodologies, the practitioner learned that although Franchisee indeed sold 1,500 fewer units of the popular menu item than anticipated, the actual profits during the 30-day period reflected mitigating profits from the sale of an alternative menu item in excess of those estimated in the but-for profits, but also additional damages from the loss of complementary drink sales and profits to customers who were lost as a result of the unavailable item.

It is possible that the effects on the plaintiff's business may be confined to a particular product or a specific customer or location, as in the previous examples. Returning to the American Kitchen example, suppose that Franchisee was unable to open a location in 2017. The lost profits could be confined to the location's profits that would have been earned but were not. Alternatively, suppose that Franchisee's inability to operate an additional location during 2017 also caused it to fail to qualify for certain volume-based price reductions with suppliers. Under this circumstance, Franchisee's damages would be equal to its lost profits at the new location but also the lost profits at other American Kitchen locations. In this context, a total-entity comparison of but-for profits and actual or mitigating profits would be appropriate.

© 2020 Association of International Certified Professional Accountants

# Chapter 5

## *Loss Period*

### Overview

One early consideration when analyzing lost profits is the applicable loss period associated with the wrongful act. Simplistically, the loss period is the time over which lost profits (or damages, more generally) have occurred or are expected to occur because of the wrongful act. Typically, the loss period

- begins on the date the wrongful act occurred and

- ends when the plaintiff is no longer earning or able to earn fewer profits than would have been earned but for the wrongful act.

As with other components of lost profits analyses, determining the appropriate loss period may not be a simple matter. Loss period start dates may be the subject of dispute between the parties, for example, due to differing views regarding when the wrongdoing or breach occurred or regarding the agreement itself. Items and information that may be relevant in determining the start of the loss period may include the following:

- The date of any breach or wrongful act

- The date that the alleged injury was sustained

- The start date of a contract

- The delivery date specified in a relevant contract

- The date of the issuance of a relevant patent or relevant patents

- Court filings, such as pleadings, answers, and rulings by the court

- Interrogatory responses, deposition testimony, or admissions

- Laches [fn 1] and statute of limitations issues

- Case law specific to the case's jurisdiction

- Discussions with the client and counsel

---

[fn 1]  *Laches* is defined as "the equitable doctrine by which a court denies relief to a claimant who has unreasonably delayed in asserting the claim, when that delay has prejudiced the party against whom relief is sought." Bryan A. Garner, *Black's Law Dictionary*, Tenth Edition (2014), West Publishing Co., Thomas Reuters, United States of America, p. 1009.

            © 2020 Association of International Certified Professional Accountants

Loss period end dates are also a common point of disagreement because the dates often occur in the future and are based on facts and circumstances on which the parties may not agree, such as forecasts of how the business will perform in the future and how long it will be until the business will "catch up" to the but-for performance. In this context, it is possible for a wrongful act to permanently impair a business. Given the nature of determining the loss period, it is often the role of the practitioner to assist the trier of fact in understanding the loss period and why the selected loss period is appropriate. Items and information that may be relevant in determining the end of the loss period may include the following:

- The date that the injured party is made whole

- The date when the wrongful act ended

- The date or period at or during which the but-for sales are equal to the forecasted actual sales

- The date of a termination provision in a contract

- The required notice period in a contract

- Any renewal provisions in a contract

- The date of trial

- The dates of any relevant injunctions or other court decisions

- Court filings such as pleadings, answers, and rulings by the court

- Interrogatory responses, deposition testimony, or admissions

- If the business survived

- If the business will be able or can be reasonably expected to fully recover

- The historical operations of the business

- Relevant industry data such as the average lifespan of the type of business at issue

- Laches and statute of limitations issues

- Case law specific to the case's jurisdiction

- Discussions with the client and counsel

Another key factor that affects the determination of the loss period is the type of case. For example, as discussed further in the following text, a loss period for breach of contract matters may differ significantly with a loss period for tort matters.

## Breach of Contract

In a breach of contract action, the loss period may be a period less than the contract's term, extend over the remaining term of the contract, or go beyond the contract term (for example, include expected re-

newal terms), depending on the circumstances. The loss period's determination may be further compli-
cated if the length of the contract is one of the issues in dispute. Disputes regarding the loss period in a
breach of contract matter may include the following considerations and factors:

- *Length of the contract.* Some contracts may explicitly provide the start and end dates of a con-
  tract, whereas others leave these dates unspecified. Even if a start and end date are provided, this
  may not be indicative of the loss period. Additionally, although the circumstances of each matter
  vary, some courts have been reluctant to award damages for the full length of the loss period
  (that is, the full term of the contract) because of uncertainty.

- *Renewal history.* If the parties have had a history of renewals or there is evidence indicating a re-
  newal may occur (such as an extension provision in the contract, testimony, or the parties' corre-
  spondence), a loss period that considers contract renewals may be warranted.

- *Contract renegotiations.* Although damages typically do not extend beyond the term of the con-
  tract (that is, because a defendant could choose to not renew the contract), an issue could con-
  ceivably arise if an extension of the contract term was being negotiated when the breach oc-
  curred. Arguably, had the breach not occurred, it may be possible that the contract would have
  been extended for some additional term. Alternatively, if a contract renewal right was controlled
  only by the plaintiff, assumption of an extension may be appropriate.

- *Notice-of-termination provisions.* Depending on the facts and circumstances of a case, the court
  may, in some situations, not extend damages beyond the length of time provided for under the
  notice-of-termination provisions. For example, if a supplier ceased supplying a customer with a
  product without notice, but the supply contract required a 90-day notice, then in the but-for
  world it may be reasonable to expect that the supplier would cease supplying the product after
  the 90-day notice period elapsed. As a result, the damage period may go from the date on which
  the supplier actually ceased supplying to a date 90 days later. However, damages may extend be-
  yond the 90 days if the customer would have purchased the product under contract in the 90-day
  period, but the customer would have used the supplied product, in a product sold to consumers or
  others later in time.

- *Other factors.* This may include confounding events, unrelated to the facts and circumstances of
  the case, such as issues in the plaintiff's industry that would have injured the business had the
  contract been performed.

Using the American Kitchen example, the franchise agreement provided for a 10-year term with the pos-
sibility of a 5-year renewal. The 11th location, associated with the wrongful act of not approving the de-
velopment plan, was planned to open in 2017. Given these facts, the loss period could possibly begin in
2017, when the new location was projected to open per the development plan. The practitioner, howev-
er, may want to consider the length of time that was required to open the 10 original locations. If the
timeline of the 11th location did not align with historical timelines of the original 10 locations, the prac-
titioner may want to investigate to determine if the loss period start date used in the development plan is
appropriate. In addition, it would likely be appropriate to consider costs to open the 11th location, in-
cluding costs that would have been incurred prior to the 11th location's projected opening date.

Possible options for the end date of the loss period include the following:

- The projected actual opening date of the 11th location, assuming that the court ruled in favor of
  Franchisee, and Franchisee can later open at the same location

      © 2020 Association of International Certified Professional Accountants

- The date at which the 11th location can be expected to be "up to speed" and to have normal and stabilized sales

- The original 2019 end date of the franchise agreement

- The 2024 renewal end date, assuming one 5-year renewal of the franchise agreement

Also relevant is if the practitioner used a loss period assuming a renewal of the franchise agreement, the practitioner would likely need to consider the key financial and quality performance metrics set forth in the franchise agreement because these were a consideration in determining if the franchise agreement would be renewed.

Expanding on the American Kitchen example, assume that the supply chain sources required to be used per the franchise agreement were unable to fulfill their contractual obligations, and Franchisee filed suit for breach of contract. In this situation, the loss period may begin immediately upon the supplier being unable to completely fulfill the contract. The loss period may then continue through a variety of different dates, depending upon the facts and circumstances of the matter, including considerations such as the following:

- If the supplier had a notice provision, the loss period may be based on the amount of notice required per the agreement.

- The supply agreement may include provisions for determining the appropriate loss period in the event of default.

- Under the franchise agreement, if Franchisee is allowed and able to find an alternative supplier, the loss period may end once the alternative supplier fully replaces the original supplier (before considering any pricing or terms differences), and Franchisee has caught back up with the expected level of performance (for example, regained or replaced lost customers).

## Torts

As described previously, business torts relate to events, other than a breach of contract, that harm a business (for example, a fraud, intellectual property infringement, or defamation). In tort actions, the loss period usually extends from the date of the wrongful act until the date operations return to "normal." The date operations return to "normal" is the date on which the business either has been restored or can be expected to be restored to a position to make profits at the same level as would have been experienced absent the tort.

Expanding upon the American Kitchen example, a possible tort could be the actions of a key individual, such as a business partner who was responsible for managing the kitchens across all locations, joining a competitor, and wrongfully convincing a key supplier to stop supplying American Kitchen (for example, by lying about American Kitchen management or the company's financial condition), which led to an increase in costs. The loss period's start and end dates for this tort could vary greatly, depending on the specific facts and circumstances of the matter. Consider the following:

- When did the supplier in question stop supplying American Kitchen?

- When was a replacement supplier found?

© 2020 Association of International Certified Professional Accountants

- Is there a time when the replacement supplier's price would match the original supplier?

- Is there a time when the original supplier will again supply American Kitchen?

- Was it reasonable to expect the original supplier to remain in place, and for how long?

Mitigation affects tort matters in the same way as it does breach of contract matters. Specifically, the plaintiff has an obligation, in many cases, to make reasonable efforts to minimize losses of revenue and profits. Using the previous tort example, this would include consideration of whether American Kitchen took reasonable steps to find a replacement supplier. Mitigation is addressed in greater detail in chapter 11.

Although determining the loss period may seem like a straightforward task at the onset of an engagement, there are several issues that may need to be considered. Due to the specific facts and circumstances present on each case, the previous discussion regarding the loss period illustrates the types of issues one may encounter. The loss period is typically an area determined by the trier of fact, where the practitioner can often perform analysis and investigation of relevant issues to assist the trier of fact to understand information relevant to the loss period.

                    © 2020 Association of International Certified Professional Accountants

# Chapter 6

## *Estimating Lost Revenues*

### Overview

The steps in determining lost profits typically follow the order of the income statement because the overarching objective of a lost profits damages analysis is to calculate the amount of lost profits incurred due to the defendant's wrongful acts, as covered by the plaintiff's claims. [fn 1]  With this in mind, one of the first elements in the calculation of lost profits is the estimation of lost revenues. *Lost revenues* are the monetary amount of sales (or other revenues) that have not and will not be earned by the plaintiff, as a result of the defendant's wrongful acts. As explained in chapter 3, this is sometimes referred to as the amount of sales the plaintiff would have achieved "but for" the defendant's wrongful acts, less the actual and mitigating revenues.

The law does not generally prescribe a specific process or methodology to measure lost revenues. Instead, credible measurements of lost revenues are commonly made when practitioners perform analyses such as the following:

- Understanding the allegations at issue and what wrongful acts are alleged to have occurred

- Understanding the agreements or contracts at issue

- Requesting, analyzing, and understanding relevant documents and information

- Assessing the reliability of available information

- Determining the applicable methods to use and prepare an estimate of lost revenues

- Reviewing the lost revenues estimate for reasonableness.

While estimations of lost revenues are enhanced by analytical steps, including those listed previously, they may also prove helpful in other parts of a lost profits analysis, a damages analysis, or a more general analysis in a dispute context. For example, identification of the loss period, avoided costs, or lost business value could follow a similar process. Each of these steps in estimating lost revenues is discussed further in the sections that follow. Although they are presented sequentially, the order or necessity of these steps may vary. For example, after preparing an estimate of lost revenues, it may be necessary to do additional research or request additional information. Or, early versions of contracts may be part of the documents requested after an initial review indicates that they are relevant.

### Understand the Allegations

---

[fn 1]   As described in previous chapters, a lost profits calculation is based on a comparison of the but-for world to the actual or mitigating world. The difference between these worlds is traceable to the wrongful acts that fall within the plaintiff's claims and causes of action.

© 2020 Association of International Certified Professional Accountants

Normally, a lost profits calculation will need to be performed before there has been a determination that the defendant violated the law and perpetrated the alleged wrongful acts. As such, the damages expert may need to perform alternative calculations accounting for different liability determinations and combinations. Court filings typically contain useful context and information — albeit from the perspective of an attorney acting as an advocate — for identifying the various lost profits analyses that may need to be performed. The practitioner should review filings in the litigation to obtain an initial understanding of the dispute and issues that should be addressed in the damages analysis. Potentially useful pleadings may include

- the operative complaint, as well as possibly the original complaint and any amended complaints, if applicable;

- answers filed in response to the complaint;

- counterclaims and associated answers and responses;

- interrogatories posed and related responses thereto;

- requests for admissions and related responses thereto;

- motions (for example, motions in limine and motions for summary judgment) filed and any associated responses or rulings; and

- other briefs (for example, mediation briefs).

## Understand the Agreements and Contracts

It is frequently important to read and understand any agreements or contracts at issue in the matter. These documents are typically at the core of any lost profits analyses involving alleged breaches of contract and certain torts. Potential topics of which to be aware when reading agreements and contracts include the following:

- The parties to the agreement or contract

- Definitions of key terms

- Economic terms of the agreement or contract

- The term of the agreement or contract and any renewal and termination provisions

- Representations and warranties of the parties to the agreement or contract

- Indemnification provisions

- Limitations on liabilities provisions

- Integration provisions with other contracts

- Provisions regarding how to measure damages if the agreement or contract is breached (for example, liquidated damages)

   © 2020 Association of International Certified Professional Accountants

- Discussion on how specific accounting terms are defined

- Provisions for certain documents to be maintained (for example, audited financial statements will be provided six months after year-end, or books and records of the company will be made available upon request)

- Provisions regarding interest on damages

For example, in the American Kitchen dispute discussed throughout this practice aid, the practitioner would likely want to understand the relevant terms of the franchise agreement between Franchisor and Franchisee before estimating lost profits damages related to a wrongful act.

## Request, Analyze, and Understand Relevant Documents and Information

The practitioner will often make a request for documents and information to be sought from each side of the dispute, recognizing that it is normally easier to obtain information from the practitioner's attorney client and end client than from the other side. Frequently, requests for information in the form or document requests, interrogatories, requests for admission, and deposition questions call for the practitioner to use judgment in asking for information from the other side, given the likelihood of objections from the other side on the grounds of relevance, privacy, and difficulty in obtaining and producing the information (it is "burdensome"). As a result, the "wish list" often needs to be trimmed to the "acceptable list." In addition, these requests are often made in the context of discovery requests going in each direction, with counsel for each side negotiating and bargaining on what will be produced. With that in mind, practitioners may need to be creative in finding ways to obtain requested information but also careful not to leave oneself without necessary information.

For the American Kitchen example, documents to request from the parties may include the following:

- The original franchise agreement, as well as any supplements, amendments, or revised versions

- The development plan provided to Franchisor

- The commentary, if any, provided by Franchisor to Franchisee related to the development plan

- Historical financial statements, profit and loss, and sales (for example, by customer, channel, location, product type, or product number) and reports for a reasonable period preceding the onset of the harm, to the present (for example, annual, quarterly, or monthly reports)

- Tax returns, including relevant schedules

- Electronic accounting records, such as a QuickBooks back-up file, if available

- Budgets, forecasts, or projections developed for individual locations from 2009 to the present, if available

- Actual performance reports of other locations during the period in question (and before, to assist in establishing comparability)

- Meeting minutes, if any, documenting discussions related to the 11th location

© 2020 Association of International Certified Professional Accountants

- Correspondence (for example, emails or letters) related to the 11th location

- Agreements with contractors or other vendors related to the 11th location

- Any market research conducted by Franchisee when preparing the development plan (this may include data on the economic environment of the area around the proposed 11th location, a list of competitors in the area of the 11th location, and industry association data, such as survey results by the National Restaurant Association)

- Store information by location, such as date opened, address, size, and number of customers

- Depositions-of-fact witnesses and other expert witnesses

- Business valuations performed on Franchisee's collective business or individual locations

In addition, it is often important for a practitioner to perform industry analysis, looking at issues like the local economy (for example, labor costs and rent rates), performance of similar businesses, forecasts prepared by industry analysts, and the competitive environment.

This list is not meant to be all inclusive or representative of all cases. Requests for documents and information is analysis-specific and case-specific and requires judgment by the expert.

## Assess the Reliability of Available Information

Although it is normal and customary for experts to rely on information provided to them during litigation, the practitioner should consider steps to assess the relevance and reliability of the information as a basis for the practitioner's professional opinions. [fn 2]  If a practitioner does not understand the information upon which the opinion relies, those opinions may be vulnerable to critique. The nature and extent of procedures necessary to assess the reliability of information will vary based on the facts and circumstances. In some cases, a conversation with members of management may suffice (for example, when the financial statements of a company have been audited). In others, the practitioner should take more substantive steps to test the accuracy and completeness of the information. If relying on the work of others, practitioners should form a sufficient understanding of how the information was developed and its characteristics (for example, how a local rent study was performed). Ultimately, the practitioner should take those steps necessary to understand the information and to be comfortable that the data are suitable to be relied on in the given circumstance.

Practitioners typically do not perform an audit, under generally accepted auditing principles, of information on which the practitioner relies in a calculation of lost profits. However, they often perform work to validate the data they receive from the client or other sources. The nature and extent of these procedures are a matter of judgment. Practitioners can reasonably anticipate that they will need to defend the basis for their opinions at deposition and trial, including the nature and extent of their procedures, to assess the reliability of the underlying data. Case law suggests that courts consider several issues when

---

[fn 2]   Relately, Statement on Standards for Forensic Services No. 1 requires the practitioner to "obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed." (Emphasis added)

© 2020 Association of International Certified Professional Accountants

evaluating the admissibility and weight of an expert's testimony that relies on client-supplied data, including

- the qualifications of client personnel supplying information,

- expert acceptance of client data, with and without testing,

- the reliability of projections provided by the client,

- the reliability and reasonableness of assumptions used to develop client projections, and

- the context within which the projections were prepared and the motives of the personnel preparing the projections.

For a more complete discussion of the case law pertaining to the use of client-supplied information, see chapter 2, "Client-Supplied Information," in the practice aid *Attaining Reasonable Certainty in Economic Damages Calculations*.

Using the American Kitchen example, if the practitioner received forecasts or projections for the 11th location, questions the practitioner may want to consider include the following:

- Who prepared the forecasts and projections? Was the preparer experienced in developing these types of materials?

- Were these projections created in the normal course or for purposes of the dispute?

- Have previous projections been met?

- Do management's projections deviate from the business's historical experience? Why?

- Do management's projections reflect a different trend or outlook for the company than is generally anticipated for the market or industry?

## Determine the Applicable Method and Estimate But-For Revenues

Establishing lost revenues is often the most challenging element of determining lost profits, in large part, because the but-for world is counterfactual (it did not occur) and, therefore, not exactly knowable. The typical methods of estimating but-for revenues include

- the "before-and-after" method,

- the "yardstick" (or "benchmark") method,

- an approach based on the terms of an underlying contract, and

- other methods, depending on the facts and circumstances of the matter.

Additional factors may need to be considered when estimating the lost profits in a newly established business or one without a history of revenues relevant to the case and business in question. A brief dis-

cussion of the issues specific to such businesses is also included in chapter 4, "Newly Established Businesses," in *Attaining Reasonable Certainty in Economic Damages Calculations*.

## The "Before-and-After" Method

This method compares the but-for revenue, estimated using the plaintiff's performance before the event or action alleged to have caused lost profits, with the plaintiff's actual (impaired) performance after that event or action. The underlying theory is that the same entity's performance from a prior time period either is a good proxy or otherwise provides a basis to project the but-for revenue to be estimated. In other words, but for the defendant's wrongful conduct, the plaintiff would have experienced the same or similar revenues and profits after the event or action as the plaintiff did before that event or action. In implementation, it may be appropriate to use parts of the plaintiff's operations, or extrapolate the historical results, in the but-for revenue estimation. For example, historical prices may be kept constant or adjusted. Alternatively, sales may be adjusted to account for population growth, demonstrated trends, or industry events. The before-and-after method, like all the methods discussed, does not necessarily call for strict implementation with duplication of historical results.

But-for revenues under this method typically rely on the plaintiff's historical accounting records. As such, the practitioner should consider the plaintiff's sales history and what factors affected its revenues and growth (or lack thereof) in the "before" period that is used to project lost revenues during the "after" period. The practitioner should consider whether and to what extent the historical revenues form an appropriate basis for determination of but-for revenues, including the following:

- Are the plaintiff's revenues affected by seasonality?

- Were there any one-time events or projects that affected revenues?

- How consistent has revenue growth been for the company over periods comparable to the damage period? What factors affected growth? Are these growth rates sustainable?

- Are there any non-violative economic factors that occurred in the "after" period that would have affected revenues?

- Is there available industry data that corroborate or support the growth rate?

- Are the types of activities used to generate revenues in the "before" period the same activities used to generate revenues in the "after" period?

- Are there any capacity issues that could limit or have limited growth or revenues?

- Has the business experienced a significant change in management, growth rates, or business activities?

- Does the "before" period include the same market and economic conditions, including the same competitors, as the after period?

- Can the differences between the "before" and "after" period be adequately and reliably accounted for in the analysis?

      © 2020 Association of International Certified Professional Accountants

Expanding on the American Kitchen example, assume that the 11th location opened in late 2013 and operated for 3 full years prior to Franchisor requiring the closing of the location. Under the before-and-after method, one way to estimate revenues would be to analyze and use the revenue data for the 36-month period prior to the location shutting down. The following table summarizes the food and beverage revenue of the 11th location.

**Figure 6.1. Historical Revenues for 11th Location**

| | 2014 | 2015 | 2016 |
|---|---|---|---|
| January | $14,163 | $12,563 | $15,622 |
| February | 19,621 | 18,587 | 19,988 |
| March | 18,934 | 18,165 | 19,115 |
| April | 19,982 | 18,966 | 20,750 |
| May | 16,440 | 17,582 | 16,923 |
| June | 10,221 | 10,450 | 10,800 |
| July | 9,365 | 9,855 | 9,562 |
| August | 15,013 | 14,982 | 16,800 |
| September | 17,933 | 18,373 | 18,509 |
| October | 19,121 | 21,252 | 30,850 |
| November | 17,632 | 17,092 | 18,333 |
| December | 17,222 | 16,785 | 18,455 |
| Total Revenue | $195,647 | $194,652 | $215,707 |

As shown in the preceding table, the location grew by $20,060 between 2014 and 2016. Possible methods to estimate lost revenues using this information may include analyzing the average monthly change in revenues, analyzing the compound annual growth rate between 2014 and 2016, or analyzing the average annual change in revenues. Although using any one of these percentages to project future revenues may be appropriate, each has different considerations.

For example, when analyzing the average monthly change in revenues, the practitioner would likely want to research any possible seasonality, such as June and July in the preceding example data, as well as any outlying months, such as October 2016.

The month of October 2016 had substantially higher revenues than other months and could be the result of a nonrecurring event, such as a large conference or other event held at the college campus where the restaurant is located. Alternatively, if a similar event were to also occur in the "after" period or can be expected to occur again, then it would likely be appropriate to include this month in the data used for the estimation, unadjusted.

If using a compound annual growth rate, the practitioner may want to consider researching the composition of the revenues in the two periods that are used in the compound annual growth rate calculation. Simplistically, a compound annual growth rate does not consider any actual data between the start date and end date. As such, it is possible that the compound annual growth rate may not be a good predictor of future growth.

As shown in this simplistic example, there are many factors that need to be considered when using the before-and-after method. One goal for the practitioner when applying this approach is to understand the driving factors behind the plaintiff's revenues and adjust for factors that could overstate or understate revenues.

## The "Yardstick" (or "Benchmark") Method

This method, like the market approach in business valuation, uses a comparable "yardstick" to estimate what the revenues and profits of the affected business would have been. Examples of possible yardsticks and information that might be employed in the estimation of but-for revenues include the following:

- The performance of the plaintiff's same or similar business at a different location

- The defendant's performance (especially if the defendant is accused of taking sales away from the plaintiff)

- The experience of a similar business unaffected by the defendant's actions

- Growth or decline in the industry

- General economic trends

- Trends in socioeconomic and population conditions

The "yardstick" chosen is a proxy for how the plaintiff's business would have performed but for the wrongful conduct of the defendant or defendants. An important step when using the yardstick method is to verify that the yardstick chosen is reasonably comparable to the plaintiff's business at issue in the matter. Items to consider when selecting a yardstick may include the following:

- Is the yardstick comparison normally used by market participants as a business benchmark, or was the yardstick created or used solely for litigation settings?

- Is the yardstick in a similar geographic location?

- Does the yardstick have the same or similar history as the plaintiff's business at issue?

- Would the yardstick be subject to similar economic conditions as the plaintiff's business at issue?

- Does the yardstick company sell substantially similar products or services (for example, fast food restaurant vs. a steakhouse)?

- Is the yardstick company a similar size to plaintiff's business at issue?

          © 2020 Association of International Certified Professional Accountants

- Is the yardstick company part of a larger company?

- Does the yardstick company have a similar market share to plaintiff's business at issue?

- Are industry averages skewed by any large companies in the industry?

- Is the plaintiff's business large enough to skew industry averages?

- Are industry data available for the geographic region of the plaintiff?

- Does the yardstick have a similar marketing strategy to that of plaintiff's business at issue?

- Does plaintiff's business at issue have historical financial results, or is it still considered a "start-up"?

- Does the plaintiff's business or a yardstick business rely on intellectual property to create revenue or profits?

Like other before-and-after method's concerns about comparability of the "before" period with the "after" period, the practitioner should consider other factors that could cause the plaintiff's performance to differ from the yardstick selected, and how those factors have been accounted for in the damages model. In this context, it may be appropriate to adjust yardstick data to account for differences between the yardstick and the affected business or to disregard the yardstick.

Using the American Kitchen example, one potential yardstick could be the results achieved by a competing restaurant on the same college campus (if the information is available). An alternative yardstick could also be a nearby restaurant owned by the plaintiff, or another American Kitchen location, if the location was not affected by the wrongful actions of the defendant or defendants. In both scenarios, the practitioner would seek to obtain financial information reflecting the results of the yardstick.

For example, in some instances, a yardstick company can provide a growth rate that would apply to an affected company's actual sales from the "before" period to estimate but-for revenues.

**Measurement Based on the Terms of the Contract**

In some instances, the lost revenues estimate is made in relation to a specific contract. In this instance, many of the elements of the lost profits measurement may be set forth in the contract document or in other communications between the parties, including

- the number of units to be sold,

- the unit prices charged,

- inflationary factors to apply to the unit price,

- the loss period,

- the minimum or maximum number of units that can be purchased,

- the minimum or maximum amount that can be billed,

© 2020 Association of International Certified Professional Accountants

- quantity discounts,

- any limitations on damages, and

- a predetermined damages formula (sometimes referred to as *liquidated damages*).

When using this method to measure lost revenues, the practitioner may develop a model to determine the revenues anticipated by the parties.

**Other Methods**

Other approaches may also be appropriate depending on the facts and circumstances involved in the matter for which lost profits are calculated. When applying other methods, the general principles underlying comparability, reasonable certainty, and the methods discussed previously should be considered in the development of a model.

One example of an alternative method is to estimate lost revenues based on market share data. Under this approach, the practitioner may analyze the market share data to estimate the percentage of its market share before and after the wrongful act. The ability to estimate lost revenues using a market share approach is dependent on the availability of relevant data on which to base the analysis, among other considerations.

Another method is to use a *multiple regression*, which is a statistical tool to estimate the impact of independent variables on a dependent variable (also discussed in chapter 7). A multiple regression can be used in the development of a revenue projection by evaluating the historical relationship between sales and independent or explanatory variables such as population, prices, competitors in the market, competitor prices, legislation, and supply costs. Once the relationship has been estimated, based on past data, it can be applied to future periods to estimate but-for sales, taking into account a wide range of potentially impactful variables to estimate sales in a world in which only one factor changed: the alleged wrongful act.

## Past and Future Lost Revenues

In many cases, the plaintiff's lost revenues may span a time period before and after the preparation of a damages calculation or before and after trial. If there are future losses (that is, the loss period extends beyond the date of trial or the preparation of the lost profits estimate), the practitioner will need to estimate both those future revenues that will be realized by the plaintiff and those revenues that the plaintiff would have realized but for the wrongful act of the defendant.

The following example highlights this issue, with the solid line representing actual amounts and the dotted lines representing projected amounts. Note that the top line is dotted for the entire loss period, given that this is the but-for revenue estimate and is projected for both past and future periods. Year 4 is when the damaging event occurred, and year 6 is when the calculation is made. The bottom dotted line represents the future projected actual revenues. The space between the top line and bottom line represents the lost revenues.

**Figure 6.2. Summary of Lost Revenues**

© 2020 Association of International Certified Professional Accountants



Although the attestation standards for financial forecasts and projections do not apply to litigation services, practitioners may want to refer to the guidance codified in AT-C section 305, *Prospective Financial Information*.[fn 3] This guidance provides information on different factors that practitioners may consider when compiling, reviewing, or otherwise testing financial forecasts and projections. These same considerations may be relevant when estimating projected revenues in lost profits calculations.

## Do the Lost Revenues Make Sense and Are They Reasonable?

Regardless of whatever method is used to estimate lost revenues, once the practitioner has performed an initial analysis, it is important to consider the reasonableness of the lost revenues calculation. Often, simple "sanity checks" can assist in evaluating the reasonableness of a measurement of lost revenues. These may include the following questions or questions like them:

- Does the company have the capacity to fulfill the sales being projected?

- Do the projections lead to an amount of lost revenues that exceeds the overall market?

- From where will the additional sales projected come?

- How would the company's increased market share affect competitors?

- Does the company have the working capital necessary to meet the additional demand projected?

---

[fn 3] All AT-C sections can be found in AICPA *Professional Standards*.

© 2020 Association of International Certified Professional Accountants   41

- Do slight changes in key assumptions result in large increases in lost revenues (for example, a 0.1% change in a growth rate yields 10% more lost revenues)?

- Does the company at issue have a track record of achieving the results reached by the practitioner?

The practitioner should consider such questions while developing the damages model to anticipate potential critiques of the analysis (for example, by the opposing expert). In this way, the practitioner will be more likely to develop a credible estimation of lost revenues.

## Scenarios

For some cases and analyses, the practitioner may develop a forecast range or provide alternative scenarios. These might be "high," "medium," and "low," or more or fewer scenarios. Although this approach may be appropriate in some cases, it may expose the analysis to critique regarding whether the opinion can be expressed with reasonable certainty or whether it is sufficiently helpful to the trier of fact. This critique is more likely when the practitioner offers a wide range of scenarios, with minimal insight into which of the scenarios is more or less likely. Lacking testimony on what would determine where in the range the but-for revenues would have landed, it leaves a projection with scenarios or a range subject to criticism that the testimony is not sufficiently helpful to the jury or trier of fact. [fn 4]

---

[fn 4]   See, for example, *Sargon Enterprises v. University of Southern California*, 288 P.3d 1237 (Cal. 2012).

© 2020 Association of International Certified Professional Accountants

# Chapter 7

## *Costs*

### Overview

As described in chapter 2 of this practice aid, lost profits are generally calculated as lost revenues less incremental costs and expenses, also called *avoidable expenses*.[fn 1]  These are the expenses avoided as a result of lost revenues not having been earned. In the American Kitchen example, if Franchisee, with 10 restaurants and stores, was unable to open an 11th restaurant as a result of Franchisor's unlawful refusal, the lost revenues notably include the revenues at the location in question. See chapter 6.

In preparing the lost profits calculation, the practitioner analyzes which costs would have been incurred in the but-for world but have been avoided without these revenues. In the American Kitchen example, without additional stores, these avoided costs would likely include the cost of food and beverages that would have been served, labor (for example, servers, food preparation, and management), cleaning, maintenance, electricity and other utilities, construction costs, financing costs, and legal fees. Other costs might include sales and marketing expense, such as promotions for the new location.

In addition, a lost profits calculation may be performed in a situation in which there has been no effect on revenue, but costs have increased as a result of the unlawful acts of the defendant. For example, if a cleaning service was under contract to clean a restaurant, but the cleaning service refused to perform as called for under the contract, the restaurant may be required to obtain a replacement cleaning service at a higher price. In this scenario, the additional costs incurred for the replacement cleaning service would be a form of lost profits because the plaintiff has experienced lower profits as a result of the higher costs, even with no revenue effect.

From the examples described previously, the estimation of incremental or avoided expenses to be deducted from revenues in an estimate of but-for profits or deducted from lost revenues to arrive at lost profits is dependent on case-specific facts and circumstances. For example, adding a restaurant to a chain is going to add costs such as building construction — costs that adding 1 hour per day or 10 more customers per day at an existing restaurant will not include. As detailed more fully in the following text, practitioners are frequently tasked with performing analysis to support the estimation of incremental costs.

### Variable, Marginal, Incremental, Saved, Avoided, and Fixed Costs

In cost accounting, costs are often categorized as fixed or variable (also sometimes referred to as *marginal costs*, although hereafter, the term *variable costs* is used in this practice aid). *Fixed costs* are generally referred to as those that do not change with an increase or decrease in sales. For example, a contractually defined lease payment on office space would typically be viewed as a fixed cost because the cost will be incurred whether sales are $0 or $100,000.

---

[fn 1]  *Costs* and *expenses* are used interchangeably in this practice aid, referencing costs incurred, regardless of whether the amount is expensed in a period or is a cost incurred but not expensed until some later period. Issues pertaining to lost cash flow, as compared to lost earnings, are addressed in chapter 2 in this practice aid.

In contrast, variable costs increase with an increase in sales. For example, if a company pays commissions of 15% of sales, the commissions represent a variable cost. Similarly, a restaurant would typically have variable costs, such as food and beverage, given that as restaurant sales increase, food and beverage costs would also likely increase. *Variable costs* are often defined by accountants as the costs that would increase with a one-unit increase in sales, but, as can be seen in the preceding commissions example, this is not always the case. For example, commissions would increase with a price increase, even without an increase in sales volumes.

*Incremental costs* are those costs that are incurred with a change between two scenarios (for example, what actually occurred versus what would have occurred "but for" the unlawful act). [fn 2]  What the "increment" is depends on the purpose of the calculation. In some situations, incremental costs may be the same as variable costs (for example, if the increment is to add one more unit of sales). However, incremental costs can also be evaluated using other measures, such as one or more additional products offered for sale, one or more additional stores opened, or one or more additional lines of business operated.

Although fixed costs do not change with a change in volume (for example, unit volume), that is not to say that fixed costs necessarily remain constant across all time periods. For example, rent expense may increase due to lease escalations, but the rent expense (in a given month) that does not change based on changes in sales volume would be considered a fixed cost. However, if there were a need to increase rent space to accommodate additional sales, then rent could become an incremental cost.

In a lost profits calculation, costs are typically categorized as incremental, saved, or avoided (hereafter simplified to incremental), or fixed, in which fixed costs in a lost profits calculation are those that do not change with the increment of the change between the but-for and actual scenario. As a result, because the increment in a lost profits calculation may be different from a one-unit change (the increment used in cost accounting for "variable costs"), fixed costs in a lost profits calculation may differ from those seen in a cost accounting exercise to estimate fixed versus variable costs.

In this context, experts are normally tasked with the estimation of which costs were saved (avoided) as a result of a disputed event or events: incremental costs not incurred because the lost revenues in question were not earned. As can be deduced from the preceding discussion, this is typically not a simple analysis and varies from case to case. The analysis of costs frequently calls for some combination of tools and analyses used by the practitioner, including

- evaluation of specific cost line items using accounting records,

- statistical analysis (for example, regression), and

---

[fn 2]   There is not a unanimous and clear definition of *incremental costs*. For example, some define incremental costs to be synonymous with variable costs, whereas others use the definition discussed in this chapter, which is consistent with the GAAP definition. The AICPA's *Working Draft: Time-share Revenue Recognition Implementation Issue* (AICPA Audit and Accounting Guide: Revenue Recognition,§ 3.7.03, January 2019.) explains that the FASB *Accounting Standards Codification*® defines incremental costs to be those that are incurred with an additional event (not just an additional unit sold): "Paragraphs 1-3 of FASB ASC 340-40-25 explain that the costs of obtaining a contract should be recognized as an asset if the costs are incremental and are expected to be recovered. Incremental costs of obtaining a specific contract are those costs that the entity would not have incurred if the contract had not been obtained."

© 2020 Association of International Certified Professional Accountants

- company-specific factual investigation.

## Evaluation of Specific Cost Line Items

As part of the analysis of the costs to be included in the determination of lost profits, the practitioner should consider the facts and circumstances related to specific cost line items. For example, it may be appropriate to adjust the analysis for one-time events, nonrecurring items, or other case-specific factors. The basis for such adjustments is a sufficient understanding of the historical cost evidence.

Using the American Kitchen example, an expert might look at the historical costs of Franchisee's other operations and locations. [fn 3]  This analysis may be performed on a line-item basis, as seen in the following table.

---

[fn 3]   Courts have also considered whether margin information provided by management is appropriate to use to calculate lost profits as applied to the particular lost sales at issue in a case. *Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620 (Tex. App. 2010) (Finding the use of a management-supplied, company-wide margin was not appropriate to apply to the customer and lost sales at issue where no additional evidence was presented to support the profit margin and its particular use by the expert).

© 2020 Association of International Certified Professional Accountants

**Figure 7.1. Historical Company Cost Analysis**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Number of Stores | 8 | 9 | 9 | 10 | 10 | 10 | 10 |
| **Store-Level Revenue and Expenses (Avg Per Store)** | | | | | | | |
| Food and Beverage Revenue | $2,361,212 | $2,090,586 | $2,406,405 | $2,223,687 | $2,419,323 | $2,653,342 | $2,837,906 |
| Direct Expenses | | | | | | | |
| Food | $472,176 | $424,671 | $495,351 | $465,325 | $513,280 | $571,594 | $620,934 |
| Beverage | $142,160 | $127,740 | $148,310 | $139,242 | $154,120 | $171,817 | $186,134 |
| Tableware | $46,829 | $42,356 | $50,051 | $46,707 | $51,429 | $57,436 | $62,218 |
| Server Labor | $354,070 | $318,582 | $372,297 | $349,287 | $384,717 | $428,586 | $465,631 |
| Food Preparation Labor | $295,714 | $212,325 | $247,845 | $292,440 | $257,218 | $286,265 | $310,090 |
| Bus Boy Labor | $118,125 | $105,980 | $124,254 | $116,319 | $128,072 | $142,502 | $155,451 |
| Total Direct Expenses | $1,369,073 | $1,231,654 | $1,438,109 | $1,349,321 | $1,488,837 | $1,658,199 | $1,800,459 |
| Gross Profits | $992,139 | $858,932 | $968,297 | $874,365 | $930,486 | $995,143 | $1,037,447 |
| Operating Expenses | | | | | | | |
| Management Labor | $82,951 | $73,937 | $86,918 | $81,050 | $90,318 | $99,795 | $108,342 |
| Insurance | $23,990 | $21,087 | $24,765 | $22,896 | $25,800 | $28,886 | $30,817 |
| Marketing | $58,891 | $53,009 | $62,207 | $58,202 | $63,998 | $71,249 | $77,729 |
| Computers and Systems | $23,978 | $21,187 | $24,654 | $23,280 | $25,713 | $29,045 | $31,324 |
| Rent | $47,322 | $42,355 | $49,291 | $46,303 | $50,868 | $56,992 | $61,892 |
| Utilities | $11,788 | $10,248 | $12,869 | $11,343 | $12,524 | $14,721 | $15,585 |
| Office Supplies | $4,541 | $4,726 | $4,954 | $4,426 | $5,087 | $5,809 | $6,294 |
| Total Operating Expenses | $253,457 | $226,549 | $265,658 | $247,500 | $274,309 | $306,497 | $331,924 |
| Operating Income | $738,682 | $632,383 | $702,639 | $626,865 | $656,176 | $688,645 | $705,523 |
| **Additional Parent-Level Expenses (Total)** | | | | | | | |
| Legal | $16,314 | $25,084 | $17,777 | $27,630 | $10,465 | $10,377 | $10,706 |
| Executive Compensation | $179,918 | $164,743 | $166,980 | $169,741 | $172,353 | $174,832 | $177,509 |
| Headquarters Rent | $29,582 | $30,568 | $30,791 | $30,983 | $31,705 | $32,570 | $33,296 |
| Utilities | $1,640 | $1,698 | $1,635 | $2,463 | $1,806 | $2,646 | $2,070 |
| Office Supplies | $1,618 | $1,764 | $1,746 | $2,347 | $1,881 | $2,439 | $2,670 |
| Total Additional Parent-Level Expenses | $290,650 | $224,662 | $220,657 | $233,697 | $219,282 | $222,624 | $226,017 |
| **Net Profit (All Stores and Parent)** | $5,678,810 | $5,466,784 | $6,103,093 | $6,034,954 | $6,342,482 | $6,663,826 | $6,829,210 |

Analysis of cost line items could involve steps such as discussions with management, review of the accounting records and system, or review of supporting documentation of line items (for example, supply agreements). For example, the expert may evaluate whether the accounting system shows regular charges, such as rent and salaries, or inconsistent costs, such as legal fees, or both, which may be driven by specific events, but may also be predictable. There may be patterns such as in businesses with seasonality. These patterns may be observable when looking at monthly data instead of annual data, or even by looking at particular cost entries, such as on the general ledger or in account transaction detail.

The following is an X-Y scatterplot of food costs against revenue, as well as a calculation of food expenses as a percent of revenue, for the years 2010–2016.

© 2020 Association of International Certified Professional Accountants

**Figure 7.2. Total Company Food Expense Compared to Total Food and Beverage Revenue**



| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Food | $3,777,407 | $3,822,040 | $4,458,162 | $4,653,255 | $5,132,803 | $5,715,936 | $6,209,342 |
| Food and Beverage Revenue | $18,889,698 | $18,815,276 | $21,657,647 | $22,236,865 | $24,193,227 | $26,533,419 | $28,379,061 |
| Food as Percent of Revenue | 20.0% | 20.3% | 20.6% | 20.9% | 21.2% | 21.5% | 21.9% |

As can be seen in the table and the chart, there is a strong correlation between food expense and revenue. Given that the entity at issue is a restaurant, the finding that food costs rise as revenues rise is consistent with what would be expected.

High correlation between costs and revenue is common in some line items, and particularly costs of goods sold. But other cost line items, such as operating expenses, frequently show less correlation to revenue. For example, the relationship between revenue and executive compensation expense is less clear when analyzed on a percent-of-revenue basis and in an X-Y scatterplot.

© 2020 Association of International Certified Professional Accountants

**Figure 7.3. Executive Compensation Expense Compared to Total Food and Beverage Revenue**



| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Executive Compensation | $1,439,343 | $1,482,684 | $1,502,822 | $1,697,414 | $1,723,532 | $1,748,316 | $1,775,089 |
| Food and Beverage Revenue | $18,889,698 | $18,815,276 | $21,657,647 | $22,236,865 | $24,193,227 | $26,533,419 | $28,379,061 |
| Exec. Comp. as Percent of Rev. | 7.6% | 7.9% | 6.9% | 7.6% | 7.1% | 6.6% | 6.3% |

Courts have recognized that the specific analysis necessary in the evaluation of incremental expenses will depend on the facts and circumstances of the business and dispute. [fn 4] Issues that are routinely encountered when performing an evaluation of specific line items include the following:

- Incomplete or missing monthly data (making a monthly trend analysis not possible).

- A business may have limited operational history.

- Limitations on data for comparable entities, resulting in the questioning of those entities' comparability and relevance.

In these types of situations, other tools may be of use. For example, in some situations the lost revenue may be from an existing business that had an impairment as a result of the disputed event (such that there may be a history of sales and costs at a level similar to the but-for world), whereas in other situations the lost revenue may be from a new business or new line of business (so the but-for world would not be similar to the historical period). In these situations, historical cost data will be less available or potentially less relevant (for example, if the comparable entity costs are different, such as a Franchisee store in a more expensive location than Franchisee's other stores or in a location that has a higher labor cost, or possibly the ability to charge higher prices, such as in an airport). In addition, the historical period may not be representative of the damage period, such as when labor or input costs per unit have risen, like the cost of eggs or if the minimum wage rises (using the American Kitchen example).

## Statistical Analysis

---

[fn 4]   See, for example, *Aon Consulting v. Midlands Fin. Benefits*, 275 Neb. 642 (Neb. 2008) (Finding salary and benefits costs need not be deducted as part of the lost profits calculation in which plaintiff had personnel available to service business obtained in breach of a noncompete agreement).

          © 2020 Association of International Certified Professional Accountants

Another tool that may be used in evaluating the relationship between costs and revenue is statistical analysis of the relationship between costs and revenue. *Regression* is a specific type of statistical analysis, quantifying the relationship between two variables (for example, food expense and revenue). It is typically performed by using a software package such as Microsoft Excel, SAS, Stata, or SPSS. In a regression, there is a dependent variable (for example, food expense) and one or more independent or explanatory variables. A regression with multiple independent or explanatory variables is referred to as a *multiple regression*. The following is a regression output from Microsoft Excel for a single-variable regression of executive compensation expenses regressed against revenue (executive compensation expenses as explained by revenue).

**Figure 7.4. Selected Regression Output: Exec. Comp. Expense Regressed Against Total Food and Beverage Revenue**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Executive Compensation | $1,439,343 | $1,482,684 | $1,502,822 | $1,697,414 | $1,723,532 | $1,748,316 | $1,775,089 |
| Food and Beverage Revenue | $18,889,698 | $18,815,276 | $21,657,647 | $22,236,865 | $24,193,227 | $26,533,419 | $28,379,061 |

| | |
|---|---|
| Beta (Slope) of Revenue Variable | 0.04 |
| Intercept | 808,811.68 |
| R-squared | 0.82 |
| T-score of Revenue Variable | 4.79 |

Per the preceding table and the data in the regression, for every $1 increase in revenue, all else equal, there is a $0.04 increase in executive compensation expense. The intercept value of $808,811.68 means that there would be executive compensation expense of $808,811.68 with no revenue, based on the data in the regression. The t-score of the revenue variable provides an indication of the strength of the explanatory power of revenue as an indicator of executive compensation expense (a higher t-score means that the data show a stronger relationship between the variables). The R-squared value of 0.82 indicates that a high portion of the variation in executive compensation expense is explained by changes in revenue. [fn 5]

In consideration of the regression output, the beta value of 0.04 is not unreasonable because it indicates that with higher revenue, there is more executive compensation expense (but not much), all else equal. Likewise, the t-score and R-squared value suggest that it may be appropriate to treat executive compensation expense as having some variable component. But the intercept value suggests that there is also a fixed component of the expense. When a cost has both fixed and variable components, it is often referred to as a *semi-variable expense* (also called *semi-incremental*). Or, there can be costs that are step-variable, such as when a business can absorb more revenue with its current office or warehouse, but at a certain point another or a larger location is needed.

The preceding regression has only one independent or explanatory variable: revenue. However, it is likely that there are other factors that affect executive compensation. For example, suppose that the franchise company hired a CFO in 2013. By adding a variable to the regression to address this fundamental change, the regression better explains the data, as seen in the following regression output.

---

[fn 5]   R-squared values range from 0 to 1, where values close to 1 indicate that the regression explains much of the variation in the dependent variable, and an R-squared value close to 0 indicates that the regression explains very little of the variation in the dependent variable.

**Figure 7.5. Selected Regression Output: Exec. Comp. Expense Regressed Against Revenue and CFO Presence**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Executive Compensation | $1,439,343 | $1,482,684 | $1,502,822 | $1,697,414 | $1,723,532 | $1,748,316 | $1,775,089 |
| CFO In Place | 0 | 0 | 0 | 1 | 1 | 1 | 1 |
| Food and Beverage Revenue | $18,889,698 | $18,815,276 | $21,657,647 | $22,236,865 | $24,193,227 | $26,533,419 | $28,379,061 |

| | |
|---|---|
| Beta (Slope) of Revenue Variable | 0.01 |
| Beta (Slope) of CFO Variable | 190,044.28 |
| Intercept | 1,221,390.45 |
| R-squared | 0.99 |
| T-score of Revenue Variable | 4.16 |
| T-score of CFO Variable | 9.05 |

As can be seen in the preceding figure, the amount that executive compensation expense increases with a change in revenue is now lower (seen with a beta of 0.01, as compared to 0.04 in the single-variable regression), and the addition of a CFO is seen to increase annual executive compensation by $190,044.28, as seen by the beta on the CFO variable. Also relevant is that the regression with two explanatory variables accounts for a higher portion of the variability in executive compensation expense, as seen by the R-squared of 0.99, as compared to the other regression's R-squared of 0.82. In other words, this regression does a better job in explaining variations in executive compensation expense, and this expense is not as strongly influenced by changes in revenue as was indicated in the first regression. Finally, the t-scores of the two variables (4.16 for revenue and 9.05 for CFO) show that the CFO variable has a stronger statistical relationship to changes in executive compensation than do changes in revenue.

Courts have, in some situations, looked favorably on the use of regression as a method to evaluate whether costs are incremental or variable, or fixed. [fn 6] Of course, simply finding correlation between cost increases and revenue increases, and assuming that those increases are a result of increases in revenue, may be misleading. As in the preceding restaurant and CFO example, it may be that revenue has increased at the same time as a new executive was hired, and that costs would have been higher, regardless of revenue. Or, it may be that the hiring decision was as a result of expansion, which would support treating at least some of that expense as incremental.

As a result, it is important to identify any confounding events that could lead to an improper conclusion related to the relationship between revenues and costs and to perform reasonableness checks when leveraging statistics-based approaches to estimate incremental costs.

## Company-Specific Factual Investigation

As described previously, a company-specific and cost-specific analysis is often helpful in analysis of incremental expenses. This also frequently applies when performing a statistical analysis such as in the preceding example. For example, it may also be appropriate to look at total expenses, or groups of expenses, and the relationship with total revenue. For example, the following is a table with total parent-level expenses compared to revenue.

---

[fn 6] See, for example, *Schneider (Europe) AG v. Scimed Life Sys., Inc.*, 852 F. Supp. 813 (D. Minn. 1994), *aff'd mem.*, 60 F.3d 839 (Fed. Cir. 1995).

© 2020 Association of International Certified Professional Accountants

**Figure 7.6. Total Parent-Level Expenses Compared to Total Food and Beverage Revenue**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Parent-Level Expenses | $230,650 | $224,662 | $220,657 | $233,697 | $219,282 | $222,624 | $226,017 |
| Food and Beverage Revenue | $18,889,698 | $18,815,276 | $21,657,647 | $22,236,865 | $24,193,227 | $26,533,419 | $28,379,061 |
| Parent-Level Exp. as a % of Rev. | 1.2% | 1.2% | 1.0% | 1.1% | 0.9% | 0.8% | 0.8% |

Parent-Level Expenses



There does not appear to be much, if any, correlation between parent-level expenses and store revenue. However, if there is a relationship between parent-level expenses and store revenue, it would likely be better seen in an analysis of the individual cost line items. For example, it is possible that individual cost line items, such as legal expenses, would rise with the addition of new stores. In fact, this is supported by the data.

**Figure 7.7. Legal Expenses, Stores Open at Year-End, and New Stores by Year**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Legal Expenses | $16,314 | $25,084 | $17,777 | $27,630 | $10,465 | $10,377 | $10,706 |
| Stores Open at Year End | 8 | 9 | 9 | 10 | 10 | 10 | 10 |
| New Stores | 0 | 1 | 0 | 1 | 0 | 0 | 0 |

Legal fees are higher in years in which new stores are launched. Whether this is simply spurious correlation, or it is an incremental cost related to the addition of a store can be investigated by, for example, reviewing the invoices for legal fees or possibly speaking with management (or asking questions in a deposition). It is also possible that certain legal fees may be covered by insurance. Again, these are issues that likely call for investigation by the practitioner.

The question in a dispute context of which costs are incremental inherently depends on the issue in question in the dispute and the particular facts of the case at hand. In the American Kitchen example, the practitioner evaluated the issue of profits lost from the inability to add a restaurant location. In this context, construction costs would likely be incremental. However, if the dispute pertained to the hours that the location was able to be open (for example, a store is forced to close at 8 p.m., and the owner believes he or she is entitled to keep it open until 10 p.m.), construction costs likely would not be incremental. Neither would marketing expense likely be incremental in a dispute about adding hours during which the restaurant could remain open. In contrast, if there was a disputed event that caused all of Franchisee's restaurants chain to close (for example, revocation by Franchisor of all franchise rights), then many more costs could become incremental, potentially including all executive compensation, as an example.

© 2020 Association of International Certified Professional Accountants

The following is a table that summarizes how cost sample line items may be incremental or fixed, depending on the scope of the analysis or dispute.

The analysis of incremental expenses is far from straightforward, and it does not lend itself well to a checklist, given the variety of issues and considerations in play. As a result, the categorization and characterizations in the following table are examples of possible characterizations. As has been described at length, the treatment of costs as incremental or fixed requires judgment and analysis, with conclusions, depending on the facts and circumstances at issue in the case.

## Figure 7.8. Possible Categorization of Costs

| | Store Closed 8-10pm on Weekdays | Single Store Not Able to Be Opened | All Franchisee Stores Closed |
|---|---|---|---|
| Food and Beverage | Incremental | Incremental | Incremental |
| Server Labor | Incremental | Incremental | Incremental |
| Food Preparation Labor | Incremental | Incremental | Incremental |
| Retaurant Management Labor | Incremental | Incremental | Incremental |
| Insurance | Semi-Incremental or Fixed | Semi-Incremental | Incremental |
| Marketing | Fixed | Semi-Incremental | Incremental |
| Computers and Systems | Fixed | Semi-Incremental | Incremental |
| Restaurant Rent | Semi-Incremental or Fixed | Incremental | Semi-Incremental or Fixed |
| Restaurant Utilities | Semi-Incremental or Fixed | Incremental | Incremental |
| Construction Costs | Fixed | Incremental | Fixed |
| Parent Legal Expenses | Fixed | Fixed | Incremental |
| Parent Executive Compensation | Semi-Incremental or Fixed | Semi-Incremental or Fixed | Incremental |
| Headquarters Rent | Fixed | Fixed | Incremental |

Certain cost line items invite differences of opinion on how these costs should be treated. Examples include overhead, corporate allocations, leases, and management fees. The common thread between these costs is that they are often large cost categories with the detailed costs not well described, or the costs may relate to amounts paid to related parties, which may be subject to discretion. As described previously, practitioners may consider whether the credibility of the damage calculation could be improved by a more detailed examination of these costs.

Other issues that may call for specific attention include the following:

- *Technological changes.* Cost structures can change with new technology, and the historical costs as a percent of revenue may not hold true across many years in a lost profits calculation.

- *Industry issues.* Often, an industry is in a state of change, such that the historical data do not provide a good basis for forecasting future costs (for example, increased regulatory expenses, labor union agreements, and health care reimbursement rates).

- *Economic and legislative issues.* Often, broader economic issues may change, such as taxes, health care, or wages, which may alter a projection of costs.

                   © 2020 Association of International Certified Professional Accountants

# Chapter 8

## *Prejudgment Interest*

### Overview

*Prejudgment interest* is an interest-based award that is sometimes made to compensate an injured party for the lost opportunity to use and make money on amounts, including lost profits, that would have been received prior to the judgment date "but for" the wrongful acts. In contrast, post-judgment interest compensates for the use of the money from the judgment date to the date on which the judgment is paid. This chapter primarily addresses prejudgment interest. There is a brief section at the end of this chapter on post-judgment interest. Given that post-judgment interest is almost always provided to a plaintiff, and expert testimony is rarely needed for these calculations, experts often make and provide calculations of prejudgment interest, as well as provide information relevant to such an award.

Prejudgment interest awards are made as part of the effort to "make a plaintiff whole." [fn 1]  The U.S. Supreme Court opinion in the intellectual property case *General Motors v. Devex* illustrates the broader concept that prejudgment interest "merely serves to make the patent owner whole because his damages consist not only of the value of the royalty payments but also the foregone use of the money between the time of infringement and the date of the judgment." [fn 2]  An award of prejudgment interest can also incentivize defendants to avoid delay in the litigation process. [fn 3]

Although awarding prejudgment interest may, in an economic sense, be required to make a plaintiff whole, the determination and calculation of prejudgment interest can be affected by case facts and legal issues, including the following:

- What a plaintiff would have done with the monies in question

- What a defendant has done with the monies in question

- Delays in the litigation process (especially if caused by the defendant's actions)

- Interest terms contained in a contract between the parties

- Whether the amounts in question were known and quantifiable (and as of when)

- Whether there was a good-faith dispute or, alternatively, abusive conduct by one or more of the parties [fn 4]

---

[fn 1]   *General Motors Corp. v. Devex Corp.*, 461 U.S. 655–56 U.S. 648 (1982).

[fn 2]   See footnote 1.

[fn 3]   *In re Pago Pago Aircrash of Jan. 30, 1974*, 525 F. Supp. 1007 (C.D. Cal. 1981).

[fn 4]   This is sometimes referred to as the *closeness of the dispute. Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 833–34 (2d Cir. 1992); *St. Louis & O'Fallon Ry. Co. v. United States*, 279 U.S. 461, 478, 483, 49 S.Ct. 384, 385, 387, 73 L.Ed. 798 (1929).

- Interest rates and the investment environment during the relevant time period

- Case law in the case's jurisdiction or venue (which may affect interest rate limits or methodologies used)

- Compounding of interest

Courts have approved several measures and considered a wide variety of issues in determining and calculating prejudgment interest. As referenced previously, frequently, the jurisdiction or venue of a dispute (for example, state vs. federal court), as well as the causes of action (for example, torts vs. breach of contract claims), will define parameters for a prejudgment interest calculation.

## Prejudgment Interest and Lost Profits Calculations Under Federal and State Law

Prejudgment interest can be awarded, at the discretion of the court, in federal matters. This aligns with consideration of the foregone opportunity to use the damages amount, from the time of loss to the time of judgment.

However, prejudgment interest is not always available — particularly in cases tried in state courts. For example, in many states, damages must be liquidated to avail prejudgment interest. Liquidated damages are amounts known by the parties or capable of being calculated without the assistance of experts. [fn 5]

For example, under California Civil Code Section 3287, prejudgment interest is due on "damages certain."

> 3287. (a) A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt.

In this context, a dispute over whether a specified amount is or is not owed by defendant to plaintiff would be a sum certain. In contrast, if a defendant owes a percentage of future lost profits, and there is a projection needed to estimate future lost profits, those would not qualify as liquidated damages (a sum certain). For example, in *Watson Bowman Acme Corp. v. RGW Construction, Inc.*, [fn 6] the California Court of Appeal found that when the parties in the litigation disputed the amount that was owed, that showed the amount to be uncertain, which rendered prejudgment interest unavailable in a breach of contract matter.

As a result, given that a lost profits calculation frequently involves a calculation of lost revenue or profits, or both, based on a comparison of a but-for world and the actual or mitigating world, and those worlds are often based at least in part on projections, lost profits calculations frequently do not qualify as liquidated damages, which leaves prejudgment interest unrecoverable in some lost profits calculations.

---

[fn 5]   Liquidated damages "can be ascertained by mere computation, and when the damages are complete at a particular time and can be determined as of such time with fixed rules of evidence and known standards of value." *Roper Corp. v. Reisz*, 718 F.2d 1004, 1007–1008 (11th Cir. 1983).

[fn 6]   *Watson Bowman Acme Corp. v. RGW Construction, Inc.*, 2016 Cal. App. LEXIS 659 (Cal. App. 5th Dist. Aug. 9, 2016).

          © 2020 Association of International Certified Professional Accountants

That said, some states evaluate prejudgment interest as a tool to be considered as a question of equity, which allows latitude in determining the availability of prejudgment interest.

For example, under Title 4, Chapter 304 of the Texas Finance Code (and Texas Common law), when prejudgment interest is awarded in a case involving a contract that provides for a specific rate of interest, it accrues at the lesser of the rate specified in the contract or 18% simple interest. [fn 7]  Prejudgment interest in cases that do not have a contract with an interest rate specified accrue interest at a rate set monthly by the Texas Consumer Credit Commissioner. [fn 8]  However, the availability of prejudgment interest under Texas law may be limited by factors such as the date on which the defendant received notice of the claim, as well as settlement offers. [fn 9]

Prejudgment interest is more often available for breach of contract causes of action than tort causes of action, which is consistent with the theme of awarding prejudgment interest when an alleged wrongdoer has reason to know of the alleged wrongdoing and, in some instances, the amount owed (for example, after a complaint has been filed) — even if this mechanism does not necessarily make a plaintiff whole.

## Sample Calculations of Prejudgment Interest

Simple interest is calculated as follows:

$$\text{Interest} = \text{Damages Amount} \times \text{Rate} \times \text{Time}$$

Total prejudgment interest is the sum of the individual years' prejudgment interest. [fn 10]  The calculation that follows uses the mid-year (mid-period) convention, which assumes that the damages amount (in this case, lost profits) is equally distributed within the time period. For example, the first period, from 3/1/16 to 12/31/16, has a mid-period date of 7/31/16. In addition, there is no prejudgment interest on future damages, which is appropriate when using the ex post approach.

**Figure 8.1. Prejudgment Interest Using Simple Interest**

---

[fn 7]   Eighteen percent is the post-judgment interest rate, as defined in Texas Finance Code Section 304.002, which is also applied to prejudgment interest under Texas common law. *See Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002).

[fn 8]   Texas Finance Code Section 304.003 and *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002).

[fn 9]   Texas Finance Code Sections 304.104, 304.105.

[fn 10]   Prejudgment interest can also be calculated using smaller time periods, such as months or quarters, which may be appropriate when there is reason to believe that the damages are not evenly distributed within the time period.

| | Lost Profits | Mid-Period Date | Judgment Date | Years of PJI | PJI Rate | PJI Factor | PJI ($) |
|---|---|---|---|---|---|---|---|
| 3/1/16 - 12/31/16 | $500,000 | 7/31/2016 | 12/31/2018 | 2.4 | 10.0% | 24.0% | $120,000 |
| 2017 | $733,333 | 7/2/2017 | 12/31/2018 | 1.5 | 10.0% | 15.0% | $110,000 |
| 2018 | $806,667 | 7/2/2018 | 12/31/2018 | 0.5 | 10.0% | 5.0% | $40,333 |
| 2019 | $887,333 | 7/2/2019 | 12/31/2018 | | | | |
| 2020 | $976,067 | 7/2/2020 | 12/31/2018 | | | | |
| 1/1/21 - 2/28/21 | $268,418 | 1/30/2021 | 12/31/2018 | | | | |
| Total | $4,171,818 | | | | | | $270,333 |

Alternatively, prejudgment interest using an annual compounding method is calculated as follows:

$$\text{Interest} = \text{Damages Amount} \times ([1 + \text{Rate}]^{\text{Number of Years}} - 1)$$

The following is a calculation of compound interest (annual compounding), using similar inputs to those from the preceding simple interest calculation.

**Figure 8.2. Prejudgment Interest Using Annual Compounding**

| | Lost Profits | Mid-Period Date | Judgment Date | Years of PJI | PJI Rate | PJI Factor | PJI ($) |
|---|---|---|---|---|---|---|---|
| 3/1/16 - 12/31/16 | $500,000 | 7/31/2016 | 12/31/2018 | 2.4 | 10.0% | 25.7% | $128,510 |
| 2017 | $733,333 | 7/2/2017 | 12/31/2018 | 1.5 | 10.0% | 15.4% | $112,706 |
| 2018 | $806,667 | 7/2/2018 | 12/31/2018 | 0.5 | 10.0% | 4.9% | $39,372 |
| 2019 | $887,333 | 7/2/2019 | 12/31/2018 | | | | |
| 2020 | $976,067 | 7/2/2020 | 12/31/2018 | | | | |
| 1/1/21 - 2/28/21 | $268,418 | 1/30/2021 | 12/31/2018 | | | | |
| Total | $4,171,818 | | | | | | $280,589 |

Courts have accepted and made calculations using annual compounding, quarterly compounding, monthly compounding, daily compounding, or even continuous compounding. [fn 11]

## Prejudgment Interest Period

Although federal law frequently allows for prejudgment interest to accrue from the date of harm to the judgment date, state court cases may have prejudgment interest begin to accrue (when permitted) from dates, such as the date of notice of an amount due (for example, filing of a complaint or a demand letter).

In an effort to "make a plaintiff whole," including the use of money from the date on which it would have been earned or received and the judgment date, courts frequently award prejudgment interest as a

---

[fn 11]  Quarterly compounding: *U.S. Philips Corp. v. KXD Technology, Inc.*, 2007 WL 4984150, at *2 (C.D.Cal. 2007). Annual compounding: *Mars, Inc. v. Coin Acceptors, Inc.*, 513 F. Supp. 2d 128, 137 (D.N.J. 2007). Daily compounding: *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991).

          © 2020 Association of International Certified Professional Accountants

matter of equity, with it beginning to accrue from the date on which the monies would have been received by the plaintiff in the but-for world. However, it is common for experts to employ simplistic assumptions regarding the timing of income streams and cash flows, such as the mid-year or mid-period convention, which assumes that the damages amounts would have been equally distributed during the period (for example, quarter or year). This assumption normally does not take into account any lag between when revenue is earned, when it would be reflected on an income statement, and when the cash would be collected. This approach also does not take into account when cash may be received as a prepayment on sales recorded at a later date.

## Prejudgment Interest Rates in Federal and State Courts

Federal courts have accepted and used rates such as the statutorily defined rates, the prime rate, corporate bond rates, corporate borrowing rates, rates of return that plaintiffs have earned on their investments, and rates provided in contracts. [fn 12]

Similarly, matters in state court can be subject to rates and structures that can vary by the nature of the dispute (for example, breach of contract vs. tort) as well as by venue.

Matters in federal court frequently use the applicable state court prejudgment interest construct. For example, when the case is in federal court because of diversity, state law defines the availability and measurement of prejudgment and post-judgment interest. [fn 13]  In contrast, federal law on prejudgment and post-judgment interest applies if it is a federal matter.

Typically, a federal statute (for example, the Patent Act or the Lanham Act) and its progeny define if and what type of prejudgment interest may be available or what is relevant to such a determination. For example, in *Kansas v. Colorado* (533 U.S. 1 (2001)), a case going back approximately 50 years, the state of Kansas sought $9 million in damages plus $53 million in prejudgment interest. In its ruling, the U.S. Supreme Court explained that counsel and experts have latitude in arguing how much prejudgment interest should be paid to make a plaintiff whole.

In this situation, practitioners can assist the court in identifying factors relevant to the selection of the prejudgment interest rate. Such considerations may include whether a plaintiff has debt that could have been repaid, the plaintiff's history of paying off debt with available funds, whether the plaintiff had to take out a loan because of the lack of available funds, or if the defendant has borrowings that it would have had to take out to have paid the damages amounts at an earlier date.

## Considerations in Selecting a Prejudgment Interest Rate

Courts have considered several factors in determining the appropriate rate to use in a prejudgment interest calculation. Depending on the case venue, prejudgment interest rates could be any of the following:

- A risk-free rate

- The defendant's cost of unsecured borrowing

---

[fn 12] *Baden Sports, Inc. v. Kabushiki Kaisha Molten*, 2007 WL 2790777, at *7–8 (W.D. Wash. 2007).

[fn 13] *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); www.cacb.uscourts.gov/post-judgment-interest-rates.

© 2020 Association of International Certified Professional Accountants

- The plaintiff's cost of unsecured borrowing

- The plaintiff's cost of capital or cost of equity

- The prime rate in effect

- A statutory rate set by the court or a statute specified by a governing body

The following is information on some of the more common rates used.

## Risk-Free Rate

A risk-free rate (for example, Treasury rates) compensates a plaintiff for the passage of time but does not account for risk associated with the cash flow or income stream. Use of a risk-free rate is often a result of considerations such as the following:

- A plaintiff may have delayed the proceedings. [fn 14]

- There has been no proof of a plaintiff borrowing monies, when those loans would have been paid off or unnecessary were the damages amounts to have been received earlier by the plaintiff. [fn 15]

- Post-judgment interest applies a risk-free rate ("a rate equal to the weekly average 1-year constant maturity Treasury yield for the calendar week preceding the date of the judgment." [fn 16]) [fn 17]

Although courts frequently use the one-year Treasury bill rate when awarding prejudgment interest using a risk-free rate, it may be appropriate to match rates from different Treasury securities, of different maturities, to align with the timing of different cash flows or income streams in a lost profits calculation.

## Defendant's Cost of Unsecured Borrowing

In some situations, courts have awarded prejudgment interest at the defendant's cost of unsecured borrowing based on the idea that the defendant has effectively borrowed the money from the plaintiff for the time between when the damages were lost and the time of the judgment. [fn 18] Use of this rate accounts for risks inherent in the defendant's business, including default and bankruptcy risk. It is helpful to seek out and analyze the defendant's borrowing history when analyzing this rate for use in a prejudgment interest award.

---

[fn 14] *Enzo Biochem, Inc. v. Applera Corp.*, No. 3:04cv929 (JBA), 2014 U.S. Dist. LEXIS 372 (D. Conn. Jan. 3, 2014).

[fn 15] *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997). *Apple, Inc. v. Samsung Elecs. Co.*, 926 F. Supp. 2d 1100, 1107–1108 (N.D. Cal. 2013).

[fn 16] *Judiciary and Judicial Procedure, U.S. Code* (USC) 28, Section 1961.

[fn 17] *Monsanto Co. v. Slusser*, No. 4:10 CV 75 DDN, 2013 U.S. Dist. LEXIS 45386 (E.D. Mo. Mar. 29, 2013).

[fn 18] *ABT Sys., LLC v. Emerson Elec. Co.*, No. 4:11CV00374 AGF, 2014 U.S. Dist. LEXIS 77136 (E.D. Mo. June 6, 2014); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 831 F. Supp. 1354, 1394–95 (N.D. Ill. 1993).

 © 2020 Association of International Certified Professional Accountants

**Plaintiff's Cost of Borrowing or Return on Investment**

When a plaintiff has borrowed money (particularly if it exceeds the amount of the damages award), courts have awarded prejudgment interest using the plaintiff's cost of borrowing, and particularly unsecured borrowing, if there is evidence of such borrowings. This is because, as described previously, the defendant has effectively benefited from an unsecured loan during the period in question. In addition, it is likely that, in some instances, a plaintiff would have paid off its borrowing at its highest rate of interest if the monies in question were available earlier. [fn 19]

As the court wrote in *Mars, Inc. v. Coin Acceptors, Inc.*, 513 F.Supp. 2d 128, 133 (D.N.J. 2007), "... in order to make [the plaintiff] whole, the Court must determine whether it would have used the money to invest, or to avoid borrowing, determine the percentage yield that [the plaintiff] either would have earned, or avoided paying, and then charge that rate to the [defendant] as prejudgment interest."

**Plaintiff's Cost of Capital or Cost of Equity**

The plaintiff's cost of capital (or cost of equity) has been argued as appropriate for the award of prejudgment interest on the theory that a plaintiff has been deprived of monies it would have had available to invest in the company, and the best evidence of the expected return on investment in a company is its cost of capital. This can be compelling when a plaintiff has raised debt and equity financing, providing evidence of capital markets' views of the returns required on an investment in the plaintiff company. The cost of capital and cost of equity in the context of discount rates are addressed in greater detail in the AICPA practice aid *Discount Rates, Risk, and Uncertainty in Economic Damages Calculations*.

**The Prime Rate and Other Rates**

The prime rate (an index rate at which commercial banks make loans) has frequently been used in awards of prejudgment interest, frequently as a representation of a lending rate for companies (for example, the plaintiff or defendant). In addition, on occasion, federal courts have used rates such as the composite bond rate, commercial paper rates, and state law prejudgment interest rates.

## The Role of the Practitioner

Sometimes, a plaintiff is required to make an election or provide notice that the plaintiff seeks prejudgment interest, whereas in other situations, prejudgment interest is available by statute under certain conditions or per the court's discretion.

Normally, damage calculations prepared before or during a trial (for example, in an expert report) do not allow for the practitioner to make the calculation with knowledge of the exact judgment date. In this context, practitioners frequently make estimates of the judgment date or calculate prejudgment interest through the report date, with an expectation of updating the calculation, including at the court's request at trial.

As such, an expert may choose in the report and disclosure of opinions stage to identify that prejudgment interest is sought, identify which interest rate or structure the expert believes is appropriate (and

---

[fn 19] *K-TEC v. Vita-Mix*, 765 F. Supp. 2d 1304, 1316 (D. Utah 2011). *Stryker Corp. v. Zimmer Inc.*, No. 1:10-CV-1223, 2013 U.S. Dist. LEXIS 171817 (W.D. Mich. Aug. 7, 2013).

© 2020 Association of International Certified Professional Accountants

why), or perform calculations. Additionally, in some instances, the expert will determine and present the daily interest that accrues on the damage amount calculated.

## Post-Judgment Interest

As described previously, in contrast to prejudgment interest, post-judgment interest is almost always awarded.

The U.S. Supreme Court explained that the "purpose of post-judgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." [fn 20]

Post-judgment interest in federal matters generally uses the one-year Treasury bill rate, compounded annually. [fn 21]

## Ex Ante and Ex Post Calculations

Ex ante damages calculations (including ex ante lost profits calculations) discount damages from all periods back to the date of the damaging event (for example, the breach of contract) and then apply prejudgment interest to bring that total damages amount forward to the date of trial. In contrast, an ex post damages calculation (for example, an ex post lost profits calculation) does not discount damages from periods prior to the damages calculation (past damages) but does discount future damages back to the date of the calculation (for example, the trial date). Prejudgment interest in an ex post damages calculation, then, only applies to past damages.

This issue and these approaches are addressed in detail in the practice aid *Discount Rates, Risk, and Uncertainty in Economic Damages Calculations*. The following is a graphic from that practice aid showing how in an ex ante calculation damages from a future period are discounted back to the time of the damages event and then brought forward with prejudgment interest. The graphic shows that when the discount rate exceeds the prejudgment interest rate, it results in a smaller award to a plaintiff when using an ex ante approach compared to an ex post approach.

**Figure 8.3. Ex Ante Discounting and Prejudgment Interest**

---

[fn 20] *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835–36 (1990).

[fn 21] *Judiciary and Judicial Procedure, U.S. Code* (USC) 28, Section 1961; *Crimes and Criminal Procedure U.S. Code* 18, Section 3612(f)(2); and *Public Buildings, Property, and Works, U.S. Code* 40, Section 3116.

 © 2020 Association of International Certified Professional Accountants



An ex ante damages calculation's lower damages figure represents the idea that damages from the past are not treated as amounts certain, but with some risk as of the date of the damages event (for example, a breach of contract), whereas an ex post damages calculation treats past damages as amounts known or certain, with the benefit from the use of information known and learned since the damages event. Case facts, venue, and law are important considerations because they may provide insight on whether an ex post or ex ante damages calculation is proper.

© 2020 Association of International Certified Professional Accountants

# Chapter 9

## *Discount Rates*

### Overview

As a general matter, *lost profits damages* are amounts that a wronged party (usually a plaintiff) has lost as a result of one or more wrongful acts. The harmed party may have already experienced such lost profits as of the time the lost profits calculation is made, may be anticipated to occur in the future, or both. As a result, future lost profits (that is, profits that were expected to be earned after the date of the making of a lost profits calculation, but in light of the wrongful act, are not expected to be earned) are often part of a lost profits calculation, as explained in previous chapters. However, in an award of future lost profits damages, the harmed party typically receives a monetary award that is deemed due as of a judgment date, when that judgment date precedes the date or dates on which the profits in question would have been earned and cash received. Because the award recipient is due this money before the profits would have been earned in the but-for world, two economic justifications are typically cited as the basis to discount future profits to their present value, as of the judgment date.

1. The plaintiff can invest the lost profits damages award received, and in that process, can expect to receive income (for example, interest income) on the damages award invested — particularly the future lost profits component. In the but-for world, the plaintiff would not have had this opportunity to invest because it would not yet have the amounts to invest.

2. As of the judgment date, the value of the expected future income stream (that is, the but-for income stream, less the actual or mitigating income stream) is less than the future value amounts that are expected, unless adjusting for the time value of money and possibly risk.

By way of example, if a business would have earned $1 million in the next year in the but-for world but is now expected to earn $0, then the undiscounted lost profit damages of the business would be $1 million (that is, $1 million of profits but-for the wrongful act, less $0 actual profits).

Although practitioners and courts generally agree that discounting of lost profits is appropriate, the rate at which the lost profits should be discounted is a frequent subject of disagreement. These disagreements often relate to the two alternative justifications cited previously for discounting future lost profits to present value, which may be argued to justify different discount rates.

Per the first justification, the objective is to identify the discount rate that, when applied to the undiscounted lost profits, accounts for the opportunity an injured party must invest the damages awarded in order to achieve the future value of the lost profits. As would be expected, this discount rate would logically align with the rate at which the injured party can invest. Some argue that this should be a risk-free rate, even if the profits in question had risk associated with them. [fn 1] Others suggest that the discount

---

[fn 1]   In fact, as a general matter, damages in personal injury matters (for example, lost personal earnings) are frequently discounted at a risk-free rate, even when this is risk associated with the injured party's lost future income. Courts have frequently cited two seminal cases in support of this approach. Per *Chesapeake & Ohio Railway Company v. Kelly*, 241 U.S. 485 (1916): "[W]hen future payments or other pecuniary benefits are to be anticipated, the verdict should be made on the basis of their present value only" (p. 491), and the rate to be used should be based on "the best and safest investment" (p. 490). Per *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523

© 2020 Association of International Certified Professional Accountants

rate should reflect the anticipated returns that the injured party could derive from an investment of the award in an asset with a similar risk profile to the future profits, even if the injured party is effectively forced into a reinvestment to replace the lost future income stream. These arguments often come down to the question of who (that is, the plaintiff or the defendant) should bear the risks associated with obtaining the future lost profits.

Alternatively, under the second justification for discounting of future lost profits, proponents assess the discount rate based on the market value of the income stream in question by estimating a market-based discount rate, rather than a discount rate appropriate to or for a specific injured party or available investment opportunity. In this context, parties frequently disagree on how to estimate a discount rate and how to account for risk in a lost profits damages calculation. For example, many practitioners choose to use a market-based discount rate when calculating lost profits for reasons such as those described previously. Others use a risk-free rate with a model that the practitioner opines has already accounted for "risk" in the development of the income or cash flow streams to be discounted. A variation on this argument is that conduct specific to the defendant's wrongdoing accounts for much or all the incremental risk, above a risk-free rate, of achieving the future lost profits.

It is important to have a clear picture of what "risk" represents in this context. For example, the right to $100 if a coin toss comes up heads, and $0 if the coin toss comes up tails, has an expected value of $50, given that there is a 50% chance of a $100 outcome and a 50% chance of a $0 outcome. In this circumstance, there is a probability of occurrence of 50%, which is incorporated into the expected value.

Probability of occurrence, however, is different from the risk that is part of capital markets' required rate of return for riskier expected future income streams. This risk has long been observed in the return on investment that capital markets expect from companies that have a wide range of possible outcomes. The relationship between variability around an expected income value and the income that investors demand has great empirical support in capital markets behavior.

For example, capital market transactions show that a 100% chance of receiving $50 is generally worth more to investors than a 50% chance of $100 because of investors' aversion to variability — even though the expected value of each of these investments is $50.

In this context, a market-based discount rate will normally be higher, for example, for an income stream to be earned by a business in a riskier industry compared to another in a less risky industry. That will apply even if the income stream in question has been reduced to an expected value (accounting for risk of occurrence). However, given that there are multiple justifications for discounting future income (including lost profits), parties may argue for a variety of discount rates, as appropriate, for the particular income stream in question.

For additional details on discounting future damages to present value, see the practice aid *Discount Rates, Risk, and Uncertainty in Economic Damages Calculations*.

---

(1983): "Once it is assumed that the injured worker would definitely have worked for a specific term of years, he is entitled to a risk-free stream of future income to replace his lost wages; therefore, the discount rate should not reflect the market's premium for investors who are willing to accept some risk of default. (p. 537), using "the appropriate discount rate, reflecting the safest available investment" (pp. 537–538).

© 2020 Association of International Certified Professional Accountants

# Chapter 10

## *Taxes*

### Overview

As a general matter and as discussed previously, a lost profits damages calculation financially attempts to put an injured party into the position in which that party would have been absent the alleged harmful act (assuming liability) or, when that exact position is not possible, a position that is equally well off. For example, if as a result of the alleged wrongful acts, a business has been forced to forgo a stream of cash flows from a period prior to trial and into the future, a lost profits calculation is often made to provide the business the present value of the lost past and future income. This is done because it is impossible to go back in time and provide the business the lost income as of the time when it would have been earned and the cash flow streams received. One complication related to this difference arises in the case of future lost profits, when the company will no longer earn or receive these incomes or cash flow streams. Assuming the injured party successfully litigates its case, the past and future lost profits (assuming both are awarded) would typically be paid in a lump sum as of the judgment date instead of over the period of time during which they would have been received. By changing the timing of when profits would be received, the injured party will pay taxes on the lump-sum award in one period instead of paying the taxes over time as would have been the case had the profits been earned over multiple periods.

Taxes are often ignored in a lost profits calculation because a plaintiff who receives a judgment will have to pay income taxes on that judgment, and the profits lost would have been taxed had they been earned by the plaintiff in the but-for world. In theory, this seemingly comports with the typical goal of awarding lost profits damages — to make the injured party whole. Of course, theory and reality do not always perfectly align, and it may be appropriate in a properly constructed lost profits calculation for practitioners to consider tax effects in the effort to ensure that the injured party receives an award that places the party in an economic position that is no better or worse than would have been experienced but-for the wrongful act.

### "In Lieu of" and "Origin of the Claim"

In a typical litigation, whether the plaintiff is awarded damages by the court or agrees to and receives a settlement, the tax treatment of the plaintiff's money received is evaluated under the *Raytheon* "in lieu of" rule. Conversely, a payment of money by the defendant to the plaintiff is analyzed under the *Gilmore* "origin of the claim" doctrine. [fn 1]

### *Raytheon* and the "In Lieu of" Test

When analyzing the appropriate tax treatment for the plaintiff, the question is "In lieu of what were the damages awarded?" In the *Raytheon* dispute, Raytheon, as plaintiff, settled its antitrust suit against Radio Corporation of America (RCA). Raytheon excluded from income $350,000 of the total $410,000 set-

---

[fn 1]   Although the tax treatment by a defendant of amounts it pays related to a litigation is not directly relevant to the plaintiff's tax treatment, this issue is discussed herein to see the other side of the payment.

       © 2020 Association of International Certified Professional Accountants

tlement amount as a nontaxable return of capital. The IRS Commissioner disagreed and determined that the $350,000 was taxable income.

Raytheon lost its case at trial and thereafter appealed. On appeal (*Raytheon Production Corporation v. Commissioner*, 144 F.2d 110 (1st Cir. 1944)), the First Circuit wrote that "recoveries which represent a reimbursement for lost profits are income." Typically, profits would be taxable income, so by deduction, proceeds of litigation to replace lost profits are also taxable. In other words, lost profits damages (or settlements received as compensation in the context of a lawsuit) are received "in lieu of" profits that would have been taxable.

Raytheon argued that the illegal conduct of RCA destroyed its business, and the lawsuit sought not to recover lost profits but, rather, the lost business and goodwill value. A return of lost business value represents a return of capital, which is not taxable. The First Circuit opinion explained that even if the settlement was a return of capital, at least some of which could be taxable as a conversion of property into cash, creates a gain to the extent that monies received exceed the cost or basis of the business or goodwill. In the Raytheon matter, there was no evidence of the basis of the business or goodwill, so the entire total of the amount Raytheon had excluded from income was taxable, albeit as a capital gain.

## Gilmore's "Origin of the Claim" Test for Damages or Settlements Paid

The corollary to the "in lieu of" test (for recipients of damages or settlements), applying to the payor of damages or settlements (including fees), is the "origin of the claim" test, first seen in *United States v. Gilmore*, 372 U.S. 39 (1963). In the underlying dispute, a marital dissolution, Gilmore's wife claimed that Gilmore's interests in three companies were community property, with which Gilmore disagreed. Gilmore prevailed but spent approximately $40,000 defending against the wife's claim. Thereafter, he deducted the litigation expenses as ordinary and necessary expenses incurred for the conservation of property held for the production of income (formerly 26 U.S.C. § 23(a)(2) and currently Code Section 212). The IRS found Gilmore's expenditures to be "personal" or to pertain to "family" and, therefore, not deductible.

The U.S. Supreme Court agreed with the IRS and determined that litigation costs are deductible only if the claim arises in connection with the taxpayer's profit-seeking activities. Deductibility depends on "the origin and nature of the claims." Here, Gilmore's legal expenses did not become deductible just because they were incurred to relieve him of a liability. Were that to be the case, costs incurred to defend almost any claim would be deductible by a taxpayer as the defense was made to clear liens on an income-producing property that the taxpayer owned. Instead, the legal claim must arise in connection with the business or profit-seeking activity at issue. In Gilmore, he was defending against claims originating from his personal divorce, not on a claim against the profit-generating business. The fact that the claim would affect his income-producing property (for example, if he had to liquidate an interest to pay the wife) was irrelevant. The origin of the claim doctrine evaluates the tax consequence of a damages or settlement payout and fees incurred based on the origin and character of the claim with respect to which the expense was incurred.

## Timing of Profits Lost Versus Damages Received

Even when the "in lieu of" test matches the nature of the lost income with the tax treatment of the damages award or settlement, there can be differences in effective tax rates, which will call for taxes to be explicitly addressed in a damages calculation. For example, this can occur when an injured party is paid a judgment in a time period that has different tax rates than were or would have been in effect when the lost profits would have been earned. This might occur when tax rates have changed from one year to an-

other. This might also occur, for example, if the income in question would have been taxed at a lower rate over a period of many years but will now be received in one year, such that some of the income will be taxed in a higher tax bracket.

The following is an example that demonstrates how a recipient of a damages award can suffer if an award is taxable as a lump sum in one year, instead of receiving the income spread out over several years, which would have allowed for the income to be taxed at a lower effective rate in a lower bracket. The example also shows the impact of a change in tax rates, which creates a disparity between the rates that would have applied when income would have been received compared to when the damages award is received.

**Figure 10.1. Example of Effect of Timing of Damages Compared to Damages Award Receipt**

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|---|
| Present Value of Lost Profits, Including PJI | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $700,000 |
| Plaintiff's Effective Tax Rate on Damages in That Year | 35% | 35% | 35% | 25% | 25% | 25% | 25% | |
| Present Value of Lost Profits, Including PJI, Post-Tax | $65,000 | $65,000 | $65,000 | $75,000 | $75,000 | $75,000 | $75,000 | $495,000 |
| | | | | | | | | |
| Plaintiff's Effective Tax Rate on Lump Sum Damages Award | | | 40% | 30% | | | | |
| Post-Tax Proceeds to Plaintiff from Lump Sum Damages Award | | | $420,000 | $490,000 | | | | |

As shown in the example, the plaintiff would have received $495,000 in after-tax profits over the years in question, but with a lump-sum damages award in 2017, the plaintiff would have received only $420,000 after taxes. If the award had been received in 2018, the proceeds would have been $490,000 because of the drop in the effective tax rate in the hypothetical but still not enough to offset the negative impact of having to recognize all the income in one year as compared to spreading it out over time.

## Discount Rates and Taxes

Another possible exception to the general rule of taxes being a nonissue pertains to the discount rate that has been used to discount future damages. For example, consider the following scenario:

Plaintiff lost a single income stream that is forecasted to be $1 million and would have been received in five years.

© 2020 Association of International Certified Professional Accountants

**Figure 10.2. Taxes on Growth During Discounting Period**

| | | |
|---|---|---|
| Judgment Date | 1/1/2019 | |
| Date of Expected Receipt | 1/1/2024 | |
| Future Years After Judgment Date of Future Receipt | 5 | |
| Discount Rate | 15% | |
| Expected Future Payment Amount | $1,000,000 | |
| Tax Rate | 45% | |
| After-Tax Amount in But-For World | $450,000 | |
| Present Value Factor | 0.4972 | 1 / (1 + 0.15)^5 |
| Amount Paid at Judgment Date | $497,177 | $1,000,000 x 0.4972 |
| Taxes on Judgment | $223,730 | |
| After-Tax Judgment | $273,447 | |
| Reinvestment Rate | 15% | |
| Amount That Judgment Date Will Grow to as of Date of Expected Receipt | $550,000 | $273,447 x (1 + 0.15)^5 |
| Income Earned From Judgment Date to Date of Expected Receipt | $276,553 | $550,000 - $273,447 |
| Ordinary Income Tax Rate | 45% | |
| Taxes on Income Earned on Judgment | $124,449 | $276,553 x 45% |
| Post-Tax Income on Judgment | $152,104 | $276,553 - $124,449 |
| Amount That Plaintiff Will Have After Paying Income Taxes on Income | $425,551 | $273,447 + $152,104 |
| Amount That Plaintiff Is Worse Off Due to Failure to Consider Taxes on Interest/Growth of Judgment | $124,449 | $550,000 - $425,551 |

As shown in the preceding table, when a plaintiff will pay taxes on the income gained from investing the judgment or settlement received (for example, at an ordinary income rate if the damages are in lieu of ordinary income), a plaintiff will be worse off if an after-tax discount rate is not used. Moreover, the tax rates paid by investors who make up the transactions that are the basis on which discount rates are estimated may also need to be considered, insomuch as they define what investors expect as income in compensation for an investment. These data are frequently used to estimate market-based discount rates.

# Chapter 11

## *Mitigation*

### Overview

A plaintiff has a duty to mitigate its damages. *Mitigation* is an action taken by a plaintiff to lessen or avoid loss from a wrongful act. The "mitigation-of-damages doctrine" is defined in *Black's Law Dictionary* as

> The principle requiring a plaintiff, after an injury or breach of contract, to make reasonable efforts to alleviate the effects of the injury or breach. If the defendant can show that the plaintiff failed to mitigate damages, the plaintiff's recovery may be reduced. [1]

Mitigation may also be referenced in some jurisdictions as the "avoidable consequences doctrine" or the "avoidability of damages theory." The concept is a legal principle: A plaintiff has an obligation to mitigate its damages and should take "reasonable, non-burdensome steps to avoid its loss." [2]

Mitigation efforts may be "negative" when the plaintiff discontinues operations as the means of minimizing its loss, or "affirmative" when the plaintiff's mitigation is through replacements, repairs, or discounts. [3]

A defendant that argues that a plaintiff has failed to mitigate damages may attempt to show how the plaintiff could have avoided damages in a reasonable manner without undue risk but did not do so. The defendant generally has the duty to show that reasonable mitigation possibilities existed but were not acted upon. The court's application of the mitigation doctrine may "consider whether a reasonable person, acting in light of the known facts and circumstances, would have taken steps to avoid certain damages." [4]  Courts have found that mitigation does not extend to arrangements that would expose the plaintiff to undue risk. [5]  Courts have also found that a failure to mitigate does not necessarily bar recovery of damages but, rather, affects the amount of damages recoverable. [6]

---

[1]   Bryan A. Garner, *Black's Law Dictionary*, Ninth Edition (2009), West Publishing Co., Thomas Reuters, United States of America, p. 1093.

[2]   *Koby v. United States*, 53 Fed. Cl. 493, 496-97 (2002).

[3]   *Lost Profits Damages* "Mitigation of Damages in the Lost Profits Calculation," by Scott M. Bouchner and Richard A. Pollack, p. 347.

[4]   *Lost Profits Damages* "Mitigation of Damages in the Lost Profits Calculation," by Scott M. Bouchner and Richard A. Pollack, p. 497.

[5]   See footnote 4.

[6]   *Meineke Car Care Centers, Inc. v. RLB Holdings, LLC, Joe H. Bajjani, Michelle G. Bajjani, a/k/a Michelle Bajjani*, U.S. Ct. of App, Fourth Circuit, No. 09-2030 (April 14, 2011).

© 2020 Association of International Certified Professional Accountants

As a general matter, for the mitigation doctrine to be applied, the defendant must plead mitigation as an affirmative defense [7] and successfully demonstrate that the plaintiff could have reduced damages by mitigation efforts. Alternatively, the plaintiff may respond that mitigation was not reasonably possible because of costs, logistics, or other issues.

## Cases With a Reduction in Lost Profit Damages for Failure to Mitigate

*Cypress Engine Accessories, LLC v. HDMS Ltd.* [8] addressed engine parts purchased by Cypress that it alleged were defective. Pursuant to an agreement between the parties, HDMS credited Cypress for the faulty parts, which were returned to HDMS. In a counterclaim, HDMS claimed that Cypress was wrongfully sold competing parts, with damages calculated as the difference between HDMS's retail price (less a restocking fee) and the wholesale price of those parts. Cypress argued that HDMS failed to mitigate its damages because it did not resell the parts in the retail market. The court found that if HDMS had resold the returned engine parts at retail value, it would not have lost money (that is, HDMS could have mitigated its losses by the resale of engine parts at retail value).

*Cambridge Plating Co., Inc. v. Napco, Inc.* [9] found error in an award of over $3 million in compensatory damages because Cambridge Plating failed to mitigate its damages. A dispute over a defective machine part could have been remedied by the purchase and installation of a new part. Cambridge Plating did not install the new part until 15 months after it knew of the defect, and the installation took one day. Although the district court recognized that Cambridge Plating failed to mitigate its damages, the court did not adjust the damage award. The appellate court vacated and remanded the district court's award because of Cambridge Plating's failure to mitigate.

## Cases With Offsets in Lost Profit Damages for Mitigation

*C & O Motors, Inc. v. General Motors Corporation* [10] addressed mitigation as an offset to lost profits damages claimed by C & O Motors, Inc. (C & O). General Motors (GM) decided to phase out its Oldsmobile line of vehicles, from 2001–2004. GM had recently entered into a five-year dealer agreement with C & O to provide Oldsmobile vehicles for sale at C & O's dealership. When GM informed C & O of the phaseout of Oldsmobile vehicles, C & O purchased rights to a Nissan dealership. The Nissan dealership was profitable and offset the lost profits that C & O claimed against GM. C & O sued GM for damages, including the costs associated with acquiring the Nissan franchise. The district court found that

---

[7] Failure to mitigate damages is generally an affirmative defense. For example, see the following cases, applying Fifth Circuit law, *E.E.O.C. v. Serv. Temps Inc.*, 679 F.3d 323, 334 n.30 (5th Cir. 2012); *Branch Banking & Trust Co. v. Lexiam Enters., LLC*, No. 3:15-CV-2928-M, 2016 U.S. Dist. LEXIS 147305, at *8 (N.D. Tex. Oct. 24, 2016). "The failure to plead an affirmative defense generally results in waiver of that defense." *Garrison Realty, L.P. v. Fouse Architecture & Interiors, P.C.*, 546 Fed. App'x 458, 465 (5th Cir. 2013); see also Fed. R. Civ. P. 8(c). "A court may excuse the failure to plead an affirmative defense, however, if the opposing party is not prejudiced." *Id.* (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971) for the proposition that "the purpose of the pleading requirement in Rule 8(c) is to give the opposing party notice and an opportunity to argue why the defense is inappropriate.").

[8] *Cypress Engine Accessories, LC v HDMS Ltd.*, USDC So. District of Texas, C. A. No. H-15-2227 (October 6, 2017).

[9] *Cambridge Plating Co., Inc. v. Napco, Inc.*, U.S. Ct. Appeals, 1st Cir. Nos. 95-1781, 95-1782 (June 3, 1996).

[10] *C & O Motors, Inc. v. General Motors Corporation*, U.S. Ct. Appeals, 4th Cir. No 08-1157 (April 1, 2009).

© 2020 Association of International Certified Professional Accountants

because C & O suffered no actual loss, it had no breach of contract loss against GM, even though the dealer agreement between GM and C & O was breached.

The appellate court agreed that C & O had no breach of contract loss against GM and noted "a plaintiff in a contract action is only entitled to be put in the same economic position that it would have been in had the contract not been breached. See *Ohio Valley Builders' Supply Co. v. Wetzel Constr. Co.*, 151 S.E. 1, 4 (W. Va. 1929); 22 Am. Jur. 2d <u>Damages</u> § 28 (2003) ("The sole object of compensatory damages is to make the injured party whole for losses actually suffered; the plaintiff cannot be made more than whole, make a profit, or receive more than one recovery for the same harm. . . . The plaintiff is not entitled to a windfall, and the law will not put him in a better position than he would be in had the wrong not been done or the contract not been broken."). [fn 11]

## Cases Showing Exceptions to the Mitigation-of-Damages Doctrine

The mitigation-of-damages doctrine is not applicable to all damage calculations, as illustrated in the following two cases.

*Ai Ping Lu v. Ravinder S. Grewal, et al.* [fn 12] was appealed by the plaintiff after the trial court found that the plaintiff mitigated all damages that resulted from a breach of contract. The respondents entered into a 10-year lease for a gas station on a property that was acquired by Ms. Lu. Although the lease did not expire until June 30, 2003, no rent was paid after September of 2000. Ms. Lu discovered that the premises were vandalized and vacated, and she and her husband made necessary repairs and operated the business. The respondents were sued for breach of the lease and argued that unpaid rent amounts should be offset under the mitigation doctrine. The respondents argued that the plaintiff fully mitigated damages with profits that were earned during the time of the respondent's breach. The trial court found that the plaintiffs suffered no damages because the mitigation profits (profits from running the business) exceeded the amount of damages owed by the respondents. The court of appeal reversed, finding that the fair market rental value was the appropriate mitigation measure to offset rents owed under a breach of contract claim for lost rents.

*Fiberlok, Inc. v. LMS Enterprises, Inc.* [fn 13] involved the supply and milling of resin by LMS for Fiberlok. Fiberlok entered into a supply contract agreement for LMS to supply Fiberlok with resin. LMS could not procure the necessary resin from a third party, Dow Chemical Company, and the absence of a reliable source of resin caused a breach of the contract between LMS and Fiberlok. LMS filed a counterclaim against Fiberlok for lost profits. The district court awarded LMS, through its counterclaim, lost profits of $460,000, based on an assumption that LMS could have purchased resin in the market and fulfilled the contract with Fiberlok. On appeal, Fiberlok argued that LMS should have continued to purchase resin for sale to other distributors. The appellate court, however, found that LMS was forced to shut down its business as a result of Fiberlok's failure to perform. Therefore, the court excused LMS from the duty to further mitigate.

## Cases Addressing Mitigating Revenues Versus Additional Revenues

---

[fn 11] See footnote 10.

[fn 12] *Ai Ping Lu. v. Ravinder S. Grewal, et al.*, 130 Cal. App.4th 790, 132 Cal Rptr.2d 406 (2003).

[fn 13] *Fiberlok, Inc. v. LMS Enterprises, Inc.,* 976 F. 2d 958, U.S. Ct. of Appeals, 5th Cir. (November 10, 1992).

            © 2020 Association of International Certified Professional Accountants

*Penncro Associates Inc. v. Sprint Spectrum PCS* [fn 14] addressed whether amounts earned by Penncro were mitigating revenues or unrelated revenues, after a breach of contract by Sprint. The district court found that Penncro avoided over $7 million in losses by taking on work for AT&T and American Water; however, Penncro argued on appeal that it could have handled the new jobs and the work for Sprint. The appeals court evaluated whether Penncro was a "lost volume seller," explaining that "[a] lost volume seller is one who has the capacity to perform the contract which was breached as well as other potential contracts, without resource or capacity constraints." Because the district court found that Penncro had the capacity to perform additional work only because of the breach of the Sprint contract (freeing up capacity), the appellate court found that Penncro was not a lost volume seller. The appeals court concluded that the Penncro work for AT&T and American Water provided mitigating revenues and not additional revenues; therefore, the amounts were proper offsets to the damages awarded to Penncro.

Conversely, *Collins Entertainment v. Coats* involved a broken six-year lease agreement for video poker machines. [fn 15] The successor entity to Coats claimed Collins's damages failed to consider the opportunity to re-lease the video poker machines. Collins countered that it held a sufficient number of machines to service the Coats contract as well as any subsequent contracts. To resolve this dispute, this court also looked to the lost volume seller doctrine. [fn 16] The court concluded Collins may have mitigating sales, but it still would have had sufficient inventory to fulfill both the lost sales and the mitigating sales. Thus, the court concluded any subsequent transactions did not qualify as a substitute or mitigation of lost sales.

## Application of the Mitigation-of-Damages Doctrine

A practitioner who is calculating lost profits should generally investigate and understand (such as by discussing this issue with counsel) if the mitigation-of-damages doctrine is applicable to the matter. If so, mitigation offsets are applied to projected losses. However, if the plaintiff incurs reasonable expenses in an effort to mitigate damages, the mitigation expenses may be recoverable as damages of the plaintiff, even if the mitigation efforts are unsuccessful.

The expert should also consider mitigation as a factor in the determination of the loss period. That is, the loss period may end when the plaintiff reasonably should have offset or mitigated any damage amounts. For example, lost profits for income-producing assets should generally end after the reasonable life of the income-producing asset.

## Limitations to the Plaintiff's Ability to Mitigate

The plaintiff's ability to mitigate is dependent upon several factors, which may include the following:

- *Plaintiff's financial ability to mitigate.* Mitigation of damages may not be possible if the plaintiff is financially unable to effectuate the mitigating activity.

- *The cost to mitigate as compared to the economic damages suffered by the plaintiff.* If the cost to mitigate is greater than the economic damage suffered as a result of the defendant's breach, it

---

[fn 14] *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1155-56 (10th Cir. 2007).

[fn 15] *Collins Entertainment v. Coats and Coats*, 368 S.C. 410 (S.C. 2006).

[fn 16] Citing the Restatement (Second) of Contracts § 347 (1981).

© 2020 Association of International Certified Professional Accountants

may not be possible or reasonable for the plaintiff to mitigate the damages in the contemplated way.

- *Technical barriers to mitigation.* The plaintiff's ability to mitigate may be affected by technology constraints or opportunities.

- *Market barriers to mitigation.* The plaintiff's marketing capabilities, taking into account its reputation, product quality, and product features, may be affected by the defendant's conduct and affect the plaintiff's ability to mitigate damages.

- *Supply-oriented barriers to mitigation.* The defendant's breach may also have affected the plaintiff's ability to obtain goods and services from its suppliers necessary for production to mitigate the plaintiff's losses.

- *Timing issues affecting the mitigation of damages.* The plaintiff's knowledge of the event causing economic harm and the time required to implement a mitigation strategy may also affect mitigation.

## Suggestions for Practitioners in Evaluating Mitigation in Lost Profits Claims

As described previously, practitioners should generally consider the mitigation efforts, if any, taken or made by the plaintiff to lessen its damages, which may affect available remedies to the plaintiff. The practitioner may describe attempts by the plaintiff to mitigate its losses to evaluate whether the plaintiff has reasonably mitigated or attempted to mitigate its losses. Alternatively, the practitioner may illustrate why the plaintiff's losses should be adjusted for mitigation factors.

The practitioner may also assist counsel by suggesting deposition questions that relate to mitigation issues. For example, lost profits in one division of a company may be offset by increased profits in another division of a company, such as other American Kitchen locations having higher sales and profits as a result of a failure to open an 11th location. The practitioner may recommend deposition questions and other information relevant to these profits for support and analysis of a mitigating activity by the plaintiff. These might include internal discussions and consideration of mitigation efforts.

Finally, the practitioner may provide an analysis of affirmative mitigation opportunities to the plaintiff, when the opportunities were not implemented. For example, the practitioner may illustrate repair or replacement costs that the plaintiff may have undertaken to minimize loss amounts. The practitioner may also illustrate that the plaintiff did not attempt to market or discount its excess product after an alleged breach to minimize loss amounts.

      © 2020 Association of International Certified Professional Accountants

# Appendix A

## *Case Opinions*

*Snac Lite, LLC v. Nuts 'N More*, LLC, 2016 WL 6778268, No. 14-cv-01695

*Syngenta Crop Protection, LLC v. Willowood, LLC, et al.*, Civ No. 1:15-cv-00274 (M.D.N.C.)

*Nebula Glass Int'l., Inc. v. Reichhold, Inc.*, 454 F.3d 1203 (11th Cir. 2006)

*Hadley v. Baxendale*, 156 Eng. Rep. 145 (Ex. 1854)

*Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243 (Ind. App. 2010)

*Biren v. Equality Emergency Med. Grp.*, 102 Cal. App. 4th 125 (2002)

*Emerald Investments Limited Partnership v. Allmerica Financial Life Insurance & Annuity Co.*, 516 F.3d 612 (7th Cir. 2008)

*Braun Elevator Co. v. Thyseenkrupp Elevator Corp.* (W.D. Wis. 2005) 379 F. Supp. 2d 993

*O2 Micro Intern. Ltd. v. Monolithic Power Systems*, 399 F. Supp. 2d 1064

*Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620 (Tex. App. 2010)

*Aon Consulting v. Midlands Fin. Benefits*, 275 Neb. 642 (Neb. 2008)

*Schneider (Europe) AG v. Scimed Life Sys., Inc.*, 852 F. Supp. 813 (D. Minn. 1994), *aff'd mem.*, 60 F.3d 839 (Fed. Cir. 1995)

*General Motors Corp. v. Devex Corp.*, 461 U.S. 648 (1982)

*In re Pago Pago Aircrash of Jan. 30, 1974*, 525 F. Supp. 1007 (C.D. Cal. 1981)

*Watson Bowman Acme Corp. v. RGW Construction, Inc.*, 2016 Cal. App. LEXIS 659 (Cal. App. 5th Dist. Aug. 9, 2016)

*Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831 (2d Cir. 1992)

*St. Louis & O'Fallon Ry. Co. v. United States*, 279 U.S. 461 49 S.Ct. 384 73 L.Ed. 798 (1929)

*Redfield v. Bartels*, 139 U.S. 694 11 S.Ct. 683 35 L.Ed. 310 (1891)

*Roper Corp. v. Reisz*, 718 F.2d 1004 (11th Cir. 1983)

*Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494 (5th Cir. 2002)

*U.S. Philips Corp. v. KXD Technology, Inc.*, 2007 WL 4984150 (C.D.Cal. 2007)

*Mars, Inc. v. Coin Acceptors, Inc.*, 513 F. Supp. 2d 128 (D.N.J. 2007)

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991)

*Baden Sports, Inc. v. Kabushiki Kaisha Molten*, 2007 WL 2790777 (W.D. Wash. 2007)

*Kansas v. Colorado*, 533 U.S. 1 (2001)

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)

*Enzo Biochem, Inc. v. Applera Corp.*, No. 3:04cv929 (JBA), 2014 U.S. Dist. LEXIS 372 (D. Conn. Jan. 3, 2014)

*Laitram Corp. v. NEC Corp.*, 115 F.3d 947 (Fed. Cir. 1997)

*Apple, Inc. v. Samsung Elecs. Co.*, 926 F. Supp. 2d 1100 (N.D. Cal. 2013)

*Monsanto Co. v. Slusser*, No. 4:10 CV 75 DDN, 2013 U.S. Dist. LEXIS 45386 (E.D. Mo. Mar. 29, 2013)

*ABT Sys., LLC v. Emerson Elec. Co.*, No. 4:11CV00374 AGF, 2014 U.S. Dist. LEXIS 77136 (E.D. Mo. June 6, 2014)

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 831 F. Supp. 1354 (N.D. Ill. 1993)

*K-TEC v. Vita-Mix*, 765 F. Supp. 2d 1304 (D. Utah 2011)

*Stryker Corp. v. Zimmer Inc.*, No. 1:10-CV-1223, 2013 U.S. Dist. LEXIS 171817 (W.D. Mich. Aug. 7, 2013)

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827 (1990)

*Raytheon Production Corporation v. Commissioner*, 144 F.2d 110 (1st Cir. 1944)

*United States v. Gilmore*, 372 U.S. 39 (1963)

*Koby v United States*, 53 Fed. Cl. 493, 496-97 (2002)

*Meineke Car Care Centers, Inc. v. RLB Holdings, LLC, Joe H. Bajjani, Michelle G. Bajjani, a/k/a Michelle Bajjani*, U.S. Ct. of App, Fourth Circuit, No. 09-2030 (April 14, 2011)

*Cypress Engine Accessories, LC v HDMS Ltd.*, USDC So. District of Texas, C. A. No. H-15-2227 (October 6, 2017)

*Cambridge Plating Co., Inc. v. Napco, Inc.*, U.S. Ct. Appeals, 1st Cir. Nos. 95-1781, 95-1782 (June 3, 1996)

*Ohio Valley Builders' Supply Co. v. Wetzel Constr. Co.*, 151 S.E. 1 (W. Va. 1929); 22 Am. Jur. 2d <u>Damages</u> § 28 (2003)

*C & O Motors, Inc. v. General Motors Corporation*, U.S. Ct. Appeals, 4th Cir. No 08-1157 (April 1, 2009)

© 2020 Association of International Certified Professional Accountants

*Ai Ping Lu. v. Ravinder S. Grewal, et al.*, 130 Cal. App.4th 790, 132 Cal Rptr.2d 406 (2003 (June 28, 2001)

*Fiberlok, Inc. v. LMS Enterprises, Inc.*, 976 F. 2d 958, U.S. Ct. of Appeals, 5th Cir. (November 10, 1992)

*Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151 (10th Cir. 2007)

*Collins Entertainment v. Coats and Coats*, 368 S.C. 410 (S.C. 2006)

*Chesapeake & Ohio Railway Company v. Kelly*, 241 U.S. 485 (1916)

*Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983)

*Hall v. Clifton Precision*, 150 F.R.D. 525 (E.D. Pa. 1993)

*In re Stratosphere Corp. Sec. Litig.*, 182 F.R.D. 614 (D. Nev. 1998)

*Haskell Co. v. Georgia Pacific Corp.*, 684 So.2d 297, 298 (Fla. Ct. App. 1996)